IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1952-06






JOHN ARLIN WALTERS, Appellant



v.



THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SIXTH COURT OF APPEALS


HOPKINS COUNTY





 Cochran, J., delivered the opinion of the Court, in which Keller, P.J., and Price,
Womack, johnson, Keasler, Hervey and Holcomb, JJ., joined. Meyers, J., not
participating.


O P I N I O N 



 Appellant shot and killed his older brother. He claimed self-defense. A jury rejected
that claim and found him guilty of murder. On direct appeal, appellant claimed that the trial
judge erred in failing to instruct the jury that it could consider prior verbal threats in deciding
the issue of self-defense. Appellant also asserted that the trial judge violated the rule of
optional completeness under Texas Rule of Evidence 107 when he allowed a 911 operator to
testify that he asked appellant if he wanted to talk about what had happened, but excluded
appellant's response. 

 The court of appeals unanimously agreed that the trial court's failure to instruct the jury
concerning prior verbal threats was reversible error under Ellis v. State. (1) Justice Ross also
concluded that the trial court's exclusion of the 911 evidence was constitutional reversible
error. Justice Carter and Chief Justice Morriss disagreed and stated that the trial court's
exclusion of appellant's response to the 911 operator was not an abuse of discretion. The court
of appeals ultimately reversed and remanded the case for a new trial. We granted review on the
State Prosecuting Attorney's (SPA's) petition to clarify the law concerning non-statutory jury
instructions and Rule 107. (2) We hold that the court of appeals mistakenly concluded that
appellant was entitled to a jury instruction on prior verbal threats. We also hold that, under the
present facts, the trial court abused its discretion in excluding appellant's response to the 911
operator's question, but that error was non-constitutional. We vacate the judgment of the court
of appeals and remand the case for further consideration.

I. THE FACTS

 On January, 16th, 2004, appellant drove his red truck with a trailer that "looks like a giant
toothpick that carries hay" to the Tabernacle Baptist Church parking lot to test some new
brakes. He hadn't driven far: Appellant lived next door to the church. He saw the church's new
pastor, David Peacock, and his wife, Sunshine, standing outside the church. Appellant got out
to visit and to tell Pastor Peacock that he had enjoyed the Sunday sermon. As appellant was
talking to the Peacocks, his brother, Russell, pulled up in his truck with Russell's wife, Jerri. 
Appellant was not expecting to see his brother because of long-standing animosity between the
two brothers over land, cattle, fences, taxes, insurance, and bills. Neither enjoyed their
meetings. On this day, Russell wanted to talk to appellant about a water bill. Jerri stayed in their
truck while Russell walked over to appellant. Appellant introduced Russell to the Peacocks,
who soon went into the church.

 The brothers started to argue. Jerri heard appellant say, "I've got the pasture leased for
five years, and I'm not paying a damn thing." She saw appellant walk back to his truck and heard
him say, "I'm leaving. I've got work to do." Russell followed him, saying, "I know the joints
you go to." Jerri could not hear appellant's response, but she saw him get into his truck. 
Russell followed him and stood beside the truck door. Appellant started his truck motor and
began moving forward while Russell walked beside him. Appellant then sped up a bit, stopped
the truck, got out, turned around, and shot Russell twice. According to Jerri, it was "totally
unexpected. They-they didn't even seem, really, to be fussing other than when-his tone of
voice was a little angry. But it had been-they had had conversations like that before, and nothing
ever happened, you know. [Appellant] would always walk off." After hearing the gunshots, Jerri
screamed, jumped out of truck, looked up, and thought that Appellant might shoot her next. She
ducked down and got back into her truck.

 Appellant got into his truck, backed out, and, as he was pulling out of the parking lot, told
Jerri, "I'm going to call for help." He drove to his home next door and called 911. Jerri ran to
Russell. Pastor Peacock came out of the church and said he had called 911. The Peacocks had
been on the steps of the baptistery when they heard the shots. They both testified that there was
a pause between the two shots-enough time for them to look at each other like "Was that what
I thought it was?"

 Corporal Moon from the Sheriff's Office was first on scene. He called EMS. 
Meanwhile Beth Hankins, a registered nurse and "First Responder," (3) tended to Russell. Russell
was transported to the hospital, where he was pronounced dead. According to the medical
examiner, Russell had been shot twice: one shot entered the left side of Russell's neck and
exited the right side of his back; the other entered the right side of Russell's lower back and
went out the right side of the chest. Either shot could have been lethal. 

 Deputies Hill and Scott went to appellant's home. Appellant had been talking on the
phone to the 911 operator, who, upon learning that appellant was the suspect, had called him
back. Appellant had agreed to surrender peacefully and did: "We hand-cuffed him, and he went
to trying to say a few things." Deputy Scott told appellant not to say anything and read him his
Miranda warnings. As he was being read his rights, appellant "looked at his wife and stated, 'I
just got tired of him threatening me.'" The deputies again told him to be quiet. 

 At trial, appellant testified that he shot his brother in self-defense with a gun that he kept
in his truck for use when "checking my cattle, maybe shooting snakes or varmints." According
to appellant, when he started to leave the church parking lot, he told Russell not to come asking
for money anymore. Russell said that he would "come looking for" appellant and that appellant
wouldn't like it. As appellant started to drive off, Russell was "as mad as the . . . as the devil"
and said, "I'm going to stop you today, once and for all." Russell then reached toward the door
of his truck and opened it. Appellant, scared for his life, stepped out, put one foot on the
pavement and shot his brother. Appellant said that he was afraid Russell would shoot him
through the door. Appellant testified that his fear was well-founded because Russell had twice
before threatened him with a gun.

II. THE JURY CHARGE ISSUE

A. The question: Is there a right to a non-statutory jury instruction on "prior verbal
threats"?

 The only disputed issue at trial was whether appellant acted in self-defense when he shot
Russell. The trial judge instructed the jury on self-defense, including apparent danger, but he
refused appellant's request to include an instruction on prior verbal threats. (4)

 On appeal, appellant complained that the self-defense charge failed to instruct the jury
that it could consider prior verbal threats made by the decedent. The court of appeals agreed,
citing Ellis v. State. (5) In Ellis, we held that when evidence supports a finding of prior threats,
a defendant is entitled to a charge like the one appellant requested. (6) We noted that, as far back
as 1929, this Court had held that "when evidence is presented that the victim verbally threatened
the defendant and that the defendant may have acted in self defense, a charge on self-defense
should not be restricted to only the acts of the victim; verbal threats should be included as
well." (7) The court of appeals held that, because self-defense was the only disputed issue before
the jury, "the trial court's failure to specifically instruct the jury concerning prior verbal threats
by the decedent was 'calculated to injure the rights of the defendant' and was, therefore,
harmful, and reversible error." (8)

 The SPA argues that Ellis is no longer good law in light of this Court's more recent
decision in Giesberg v. State. (9) In Giesberg, we held that a defendant is not entitled to an 
instruction on "alibi" because alibi is not a statutory Penal Code defense and the issue is
adequately covered by the general jury charge which requires proof of identity. (10) "Because alibi
was merely a negation of elements in the State's case, its inclusion would be superfluous, and,
in fact, would be an impermissible comment on the weight of the evidence." (11)

 After Giesberg, according to the SPA, defendants are not entitled to any "prior verbal
threats" instruction because that instruction was derived from a 1925 Penal Code statute that
was repealed by the 1974 Penal Code. (12) Thus, evidence of prior verbal threats, like alibi, is
encompassed within the general self-defense jury instructions. Further, appellant received an
instruction on the common-law doctrine of "apparent danger," which reinforced the statutory
language concerning his reasonable belief of danger. Finally, because an instruction on prior
verbal threats focuses the jury's attention on "the specific evidence that appellant claims made
the victim's actions 'apparently dangerous,'" its inclusion would be an impermissible comment
on the weight of the evidence. (13) 

 Appellant counters that Giesberg is not applicable because it deals solely with an alibi
instruction, which is not a statutory defense under the 1974 Penal Code. (14) The instruction he
requested relates to self-defense, a defense that is statutorily based. Further, says appellant,
"the instruction requested . . . is not a comment on the weight of the evidence, but rather more
adequately and appropriately defined the scope of the apparent danger, without being fact
specific." (15) 

 We granted review to address the effect of Giesberg on common-law jury instructions.

B. The law: Jury instructions on defensive issues.

 Under Texas law, the judge must provide the jury with "a written charge distinctly setting
forth the law applicable to the case; not expressing any opinion as to the weight of the evidence,
not summing up the testimony, discussing the facts or using any argument in his charge
calculated to arouse the sympathy or excite the passions of the jury." (16) This law requires the
trial judge to instruct the jury on statutory defenses, affirmative defenses, and justifications
whenever they are raised by the evidence. (17) A defendant is entitled to an instruction on every
defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble,
unimpeached, or contradicted, and even when the trial court thinks that the testimony is not
worthy of belief. (18) As noted by Professors Dix and Dawson,

 Traditionally, Texas law gave the defendant the right to require the trial
court to submit to the jury any defensive theory supported by the evidence. In
many of the cases, no distinction was made between a defensive theory that
merely negated an element of the offense and a defensive theory that was in the
nature of a confession and avoidance, that is, that did not negate an element but
that relied upon an independent justification for committing the offense.

 An example of the former would be alibi, while an example of the latter
would be self-defense. 

 . . . This approach had the advantage for the defense of the trial court
legitimating for the jury the defensive theory or theories relied upon. Such an
instruction would be expected to form the basis for the defense argument to the
jury. (19)

 After the 1974 Penal Code was enacted, however, we re-examined that traditional
position and slowly recognized that instructions on defensive theories not set out in the 1974
Penal Code were inconsistent with the Legislature's intent. (20) In a series of more recent cases,
we have held that if the defensive theory is not explicitly listed in the penal code-if it merely
negates an element in the State's case, rather than independently justifying or excusing the
conduct-the trial judge should not instruct the jury on it. In Giesberg, (21) we explained why:

 A defensive issue which goes no further than to merely negate an element
of the offense alleged by the State in its indictment does not place a burden of
proof upon a defendant to establish it. The burden of proof is upon the State to
prove those allegations. An alibi only traverses those allegations and casts doubt
upon whether the State has met its burden. As a result, an alibi is sufficiently
embraced in a general charge to the jury that the defendant is presumed innocent
until he or she is proven guilty beyond a reasonable doubt. There is ample room
within that instruction for a defendant to effectively argue his defense of alibi to
a jury. 

 Since a defensive issue of alibi is adequately accounted for within a
general charge to the jury, a special instruction for the issue of alibi would
needlessly draw a jury's attention to the evidence which raised alibi. Therefore,
we conclude a special instruction on alibi would constitute an unwarranted
comment on the weight of the evidence by the trial court. (22)


For the same reasons, we have held that a defendant is not entitled to a defensive charge on
accident, (23) good faith, (24) alternative cause, (25) independent impulse, (26) or suicide (27) under the 1974
Penal Code. The question here is whether this line of cases-each dealing with a non-statutory
defense-applies to an instruction that relates to a statutory defense, but is based on a statutory
provision that was repealed in the 1974 Penal Code.

C. The answer: There is no right to a non-statutory jury instruction on "prior
verbal threats."

 Although the State argues that, under Giesberg, the holding in Ellis (that a defendant is
entitled to a "prior verbal threats" instruction) is no longer good law, we agree with appellant
that Giesberg does not necessarily control the present situation. First, while the "prior verbal
threats" instruction is derived from a 1925 statute that was not brought forward into the 1974
Penal Code, it relates to self-defense which was brought forward into the 1974 Penal Code.
Second, as noted by both parties, we have already held that some pre-1974 common-law
instructions on self-defense survived in the 1974 Code.

 In Young v State, (28) a voluntary-manslaughter case decided shortly after the 1974 Penal
Code was enacted, we held that the trial court erred by not instructing the jury that the defendant
had a right to arm himself and to seek an explanation when he confronted the deceased regarding
their differences. The State had agreed that the law entitling a defendant to an instruction on
the right to arm himself had been well settled, but it argued that the new Penal Code changed
the law of self-defense. (29) Specifically, the State claimed,

 Section 9.31 was an attempt to codify the existing case law pertaining to
self-defense and that provoking the difficulty limitation upon self-defense was
written into Subsection (b)(4) of said Section 9.31 and that since the Legislature
saw fit to include the law on provoking the difficulty but failed to include any
provision on the right of an actor (accused) to arm himself and seek an
explanation, such right no longer exists. (30) 

This Court explicitly rejected that argument and declined to overrule the common-law rule 
"which has long been part of the case or decisional law of this State." (31) 

 Although self-defense is a statutory defense, several courts of appeals have reasoned
that, under Giesberg, a defendant is no longer entitled to a "right to arm" instruction because
the "right to arm" statute was not carried forward into the 1974 Penal Code. (32) These courts have
held that, under Giesberg, trial courts should not give any special instructions that are not
expressly based upon a statute, even if those instructions relate to a statutory defense. Under
this reasoning, all jury instructions relating to a Penal Code offense or defense must be
statutorily based. 

 These holdings reflect the Texas Legislature's 1974 policy decision concerning
statutory offenses and defenses-to simplify the criminal law and the jury instructions. Juries
may consider and evaluate the evidence in whatever way they consider it relevant to statutory
offenses and defenses. (33) The policies reflected in the 1974 Penal Code and in the Giesberg
line of cases, persuade us that special, non-statutory instructions, even when they relate to
statutory offenses or defenses, generally have no place in the jury charge. (34) 

 Before the 1974 Penal Code was adopted, many statutory defenses included specific
descriptions of the type of evidence that established that defense. In those cases, a trial judge
appropriately instructed the jury on the wording of the entire statute. The instruction was not
considered a comment on the weight of evidence (even if it was) because the statute expressly
mandated what evidence should be considered for what purpose. When these descriptions were
carried forward into the current code, instructions regarding them are still appropriate. (35) But
when these common-law doctrines or descriptions have not been carried forward into the Penal
Code, instructions on them would constitute a comment on the weight of the evidence that the
Legislature has not expressly authorized. When the legislature has not enacted specific statutes,
courts may conclude that it intended this silence in the law and in the jury instructions.

 Thus, under the Giesberg rationale, we hold that, generally speaking, neither the
defendant nor the State is entitled to a special jury instruction relating to a statutory offense or
defense if that instruction (1) is not grounded in the Penal Code, (2) is covered by the general
charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may
support an element of an offense or a defense. In such a case, the non-statutory instruction
would constitute a prohibited comment on the weight of the evidence. 

D. Appellant was not entitled to a jury instruction on "prior verbal threats."

 In this case, the "prior verbal threats" instruction meets all three criteria. 

 First, the former penal code provisions, on which Ellis relied, contained specific
language pertaining to acts or words of the victim, (36) but the current statutes do not. 

 Second, the charge requested was covered by the self-defense charge given-one that
included an instruction on apparent danger. (37) As the court of appeals noted, the instruction on
"apparent danger" correctly defined a "reasonable belief" as "a belief that would be held by an
ordinary and prudent man in the same circumstances as the actor." (38) We agree with the court of
appeals that "that viewpoint necessarily includes verbal threats that occurred before, as well as
at the time of, the incident at bar." (39) Nothing in the jury instructions prevented the jury from
considering prior threats, including the statutorily based instruction that the use of force "is not
justified in response to verbal provocation alone." (40) The Texas Legislature has determined that
present verbal provocation, by itself, is insufficient to support self-defense, but that statute does
not limit the relevance or importance of prior verbal threats as they may affect a person's
reasonable belief that defensive action may be immediately necessary to protect against the
decedent's use of present unlawful force.

 Third, the requested instruction is not benign. Instead, it focuses the jury's attention on
a specific type of evidence that could support a finding of self-defense. Like the instruction
that we held was error in Brown v. State (41) ("Intent or knowledge may be inferred by acts done
or words spoken"), this instruction is a marginally "improper judicial comment" because it is
simply unnecessary and fails to clarify the law for the jury. The instruction improperly tells the
jury how to consider certain evidence before it. Though it does not pluck out any specific piece
of evidence, it does focus the jury's attention on a specific type of evidence that appellant
claims made the victim's actions appear dangerous to him.

 In short, though the parties may offer any evidence that would support or refute a finding
of self-defense, the parties are not entitled to special, non-statutory jury instructions on how
to consider or evaluate specific types of evidence introduced to prove or disprove that defense. 
Normally, if the instruction is not derived from the code, it is not "applicable law."

 The trial court in this case properly refused appellant's requested instruction and
properly left it to the advocates to argue the significance of each specific piece of evidence. (42) 
III. THE RULE 107 ISSUE

A. The questions: 1) Does Texas Rule of Evidence 107 require the introduction of
otherwise inadmissible evidence-the defendant's hearsay assertion of self-defense
made to a 911 operator-when the State introduces the recording of a prior 911
conversation, and testimony from the operator about the second one? 2) If so,
does a violation of Rule 107 constitute constitutional error?

1. The relevant facts.

 Officer English was working as a 911 dispatcher on the day of Russell's death. He
testified for the State on direct examination that the Sheriff's Office received three 911 calls
related to this homicide and that he made an outgoing fourth call. The first call came in at 2:06
p.m. from the Tabernacle Baptist Church. An unidentified female reported a "disturbance" and
said that a "red truck had just pulled off." A second call, at 2:08 p.m., came from the "John
Walters residence on FM 269." Appellant, without identifying himself, told Officer English
that "a man had been shot at the Tabernacle Baptist Church." The officer told him, "We've got
somebody on the way." At 2:18 p.m., Carolyn Mobley called from a cell phone. She said that
she was at the church; she named Russell Walters as the victim and the suspect as John Walters. 
She said John Walters was at his home. Recordings of all three of these calls were played, in
their entirety, for the jury. Officer English testified that, after the third call, he realized that the
second call had likely been from appellant. Feeling "very confident" that appellant was the
suspect, Officer English called appellant's home "to advise him to come out of the residence
so the [responding] officer could speak to him with regard to what had happened."

 Officer English testified that appellant answered the phone and identified himself. The
officer then asked appellant "if he wanted to talk about what happened . . . ." Before the officer
could finish his answer, the State redirected him and guided the questions toward "officer
safety." Officer English then said that appellant was cooperative as English talked him through
unloading and securing his gun and surrendering peacefully to the officers outside.

 On cross-examination, Officer English clarified that, when this second conversation took
place, "First Responders" were at the scene. Officer English asked appellant if he wanted to talk
about what had happened. When defense counsel asked what appellant's answer was, the State
objected. After arguments outside the presence of the jury, the trial court sustained the State's
objection and rejected defense counsel's claim that the answer to the question was admissible
under Rule 107, the rule of optional completeness. Defense counsel argued that "not allowing
us to show the totality of that conversation will leave a false impression with this jury that our
client didn't say anything in response to, 'Would you like to tell me what happened?'"

 On redirect, Officer English stated that appellant was unusually calm when he called in. 
The defense later called Officer English outside the jury's presence to make an offer of proof
of the entire contents of this fourth 911 call. (43) In relevant part, that call was as follows:

 Hello.

 Hey John.

 Yes.

 Hey this is Sean over here at the Sheriff's office.

 Yeah.

 What's happening man?

 My brother come over here threatening me, one of several times.

 Did he?

 Yep.

 Allright.

 He told me one time he was gonna kill me out there at the barn.

 Oh Really.

 Yep.

 Allright John, everything's gonna be okay?

 Yep.

 Uh, Are you inside your house right now?

 Yes sir, I am inside my house right now. I'm the one that called 911.


Appellant's counsel wanted to question Officer English about this dialogue or play the whole
911 call. He again relied upon the rule of optional completeness and insisted that this evidence
was necessary to rebut the false impression that appellant (1) had not answered Officer
English's question about what had happened, and (2) had been calm, unaffected, and
unforthcoming about the killing. Defense counsel noted that First Responder Beth Hankins,
described appellant as "not in shock, not shut down, and just matter-of-fact" about the shooting
when she listened to the first 911call. The court listened to the 911 recording three times
before sustaining the State's objection again. 

2. The direct appeal.

 On direct appeal, appellant argued that the exclusion of his second 911 conversation with
English violated the rule of optional completeness because the State used the first 911 call and
a portion of the second one to paint a false picture of him as a "calm, cool killer," so relaxed
that he was drinking a Pepsi as he spoke. Justice Ross agreed (44) and also noted that the rule
compelled admission because of the State's use of the second 911 call to create an unfair and
incomplete portrait of appellant's demeanor. (45) He found that the exclusion "directly resulted
in the violation of not one, but two separate constitutional rights." (46) First, it violated appellant's
right to remain silent, because it "required appellant to testify so that his defensive theory could
be raised by something more than rank speculation." (47) Second, he was denied the opportunity
to cross-examine the State's witnesses. Applying Rule 44.2(a), Justice Ross found reversible
error. (48) 

 Justice Carter, in a concurring opinion joined by Chief Justice Morriss, disagreed that
the trial court's exclusion was error in the first place because "the State did not introduce any
specific statement from that [second] conversation that could mislead the jury." (49) Likewise, "the
call to Walters' residence is not a continuation of the prior conversation that would require
admission to complete the cycle of conversations. The telephone calls stand independently, and
one is not needed to understand the other." (50) 

 Because Justice Ross's majority opinion on the jury instruction issue was not a majority
opinion on the admissibility of the 911 call, we would not normally address this evidentiary
issue. But because we reverse the court of appeals on the jury instruction issue, and the SPA
had asked us to review the admissibility of the 911 call ruling in that event, we do so-after full
briefing by the parties-to prevent an endless "appellate orbit" cycle. 

3. The parties' arguments in this Court.

 The SPA asserts that, because the State did not create a false impression with the jury,
appellant's hearsay statements to the 911 operator were not admissible. First, the exclusion of
the answer to the question "what's going on?" did not itself create a false impression because
the "State did not suggest that Appellant had never previously mentioned threats until trial. In
fact, one of the officers testified he heard appellant tell his wife immediately after his arrest,
'I just got tired of him threatening me.'" (51) Second, the exclusion did not affect the jury's
understanding of the first conversation. Third, the exclusion did not "hide the ball" from the jury
concerning appellant's demeanor during the second conversation because that evidence could
have been offered in a non-hearsay way, through cross-examination. (52) 

 The SPA also argues that, even if the trial judge's exclusionary ruling was an abuse of
discretion, the error was not constitutional. It was not a Sixth Amendment violation because
defense counsel was free to cross-examine English about appellant's demeanor. (53) And it was
not a Fifth Amendment violation because appellant would still have to take the stand to raise
self-defense because appellant's answers to English were insufficient, by themselves, to raise
that defense. (54)

 Appellant argues that the exclusion of his second 911 conversation with English was
constitutional error because "the State was allowed to create the impression that the defendant
was a calm, cold-blooded killer rather than a man who defended himself and then reacted with
shock in overwhelming circumstances, and the defendant was denied any way to refute this
falsehood other than testifying." (55) 

B. The law: Texas Rules of Evidence 107 and 103(a), and Texas Rule of Appellate
Procedure 44.2. 

 We review a trial court's decision to admit evidence under an abuse of discretion
standard. (56) The trial court abuses its discretion only when the decision lies "outside the zone
of reasonable disagreement." (57) Hearsay statements are generally not admissible unless the
statement falls within a recognized exception to the hearsay rule. Rule 107, the rule of optional
completeness, is one such rule. (58) This rule is one of admissibility and permits the introduction
of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain
a matter "opened up" by the adverse party. (59) It is designed to reduce the possibility of the jury
receiving a false impression from hearing only a part of some act, conversation, or writing. (60)
Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless
it is necessary to explain properly admitted evidence. (61) Further, the rule is not invoked by the
mere reference to a document, statement, or act. (62) And it is limited by Rule 403, which permits
a trial judge to exclude otherwise relevant evidence if its unfair prejudicial effect or its
likelihood of confusing the issues substantially outweighs its probative value.

 Texas Rule of Evidence 103(a) addresses the effect of the erroneous exclusion of
evidence. It states, "Error may not be predicated upon a ruling which . . . excludes evidence
unless a substantial right of the party is affected, and . . . the substance of the evidence was made
known to the court by offer, or was apparent from the context within which questions were
asked." (63) 

 The rule is a codification of the common-law doctrine that a claim of error on appeal
may not be based on an evidentiary ruling unless it affects a "substantial" right of a party. (64) 
"Substantial rights are affected when the error has a substantial and injurious effect or influence
in determining the jury's verdict." (65) This common-law doctrine is repeated in Rule of Appellate
Procedure 44.2(b), which applies to non-constitutional errors: "Any other error, defect,
irregularity, or variance that does not affect substantial rights must be disregarded." (66) As we
stated in Potier v. State, (67) "Strictly speaking, the specific rule that applies to this [evidentiary]
error . . . is Rule of Evidence 103(a) . . . . But the standard of review under that rule is the same
as that under Rule of Appellate Procedure 44.2(b)." (68) 

 The erroneous exclusion of evidence offered under the rules of evidence generally
constitutes non-constitutional error and is reviewed under Rule 44.2(b). (69) The exception is
when erroneously excluded evidence offered by the criminal defendant "forms such a vital
portion of the case that exclusion effectively precludes the defendant from presenting a
defense." (70) Exclusion of evidence might rise to the level of a constitutional violation if: (1) a
state evidentiary rule categorically and arbitrarily prohibits the defendant from offering
otherwise relevant, reliable evidence vital to his defense; or (2) a trial court's clearly erroneous
ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's
theory of defense and effectively prevents him from presenting that defense. (71) In such a case,
Rule 44.2(a), the standard for constitutional errors, would apply. (72)

 Either way, "it is the responsibility of the appellate court to assess harm after reviewing
the record and . . . the burden to demonstrate whether the appellant was harmed by a trial court
error does not rest on the appellant or the State." (73) Of course, "the parties may assist by
suggesting how the appellant was harmed (or not), but it is the responsibility of the reviewing
court to decide whether it is likely that the error had some adverse effect on the proceedings." (74)

C. The answers: 1) Rule 107 requires the introduction of the defendant's hearsay
statement to the 911 operator after the State introduced a recording of his first
911 call and testimony from the operator about the second one; 2) The trial
court's erroneous ruling was not constitutional error.

1. The trial court's ruling was an abuse of discretion.

 We agree that the trial court's ruling excluding the evidence of the second 911
conversation was an abuse of discretion. The present situation is similar to that in Renteria v.
State. (75) There, the State opened the door to evidence of the defendant's expression of remorse
during its questioning of an expert witness because that questioning had left the jury with a false
impression that appellant had not expressed any remorse. In Renteria, we stated that "the
federal constitution does not require admission of a defendant's self-serving, out-of-court
declarations of remorse when they are inadmissible under state law even when these
declarations meet the test of constitutional 'relevancy,'" (76) but we noted that the evidence
offered was more than relevant. It was necessary to correct a false impression of "no remorse"
that the State, through the questioning of its expert, had itself created. (77) 

 In this case, as in Renteria, the State, through the questioning of its witnesses, opened
the door to the admission of the second 911 call to correct a false impression that it had
created. (78) The record shows that the State's questioning of Officer English and Beth Hankins
left the jury with the impression, later emphasized during closing arguments, that appellant had
not given any explanation of the shooting immediately after the event. Officer English testified
that he asked appellant if he wanted to talk about what had happened. That question hovered in
the air, but the State cut the witness off and redirected him to other matters. The jury did not
hear that, from the very beginning, appellant told officers that he shot his brother in self-defense. Appellant's words to Officer English were: "My brother come over here threatening
me, one of several times," and "He told me one time he was gonna kill me out there at the barn." 
The State played the initial 911 call three times for the jury. During closing argument, it harped
on appellant's preternatural "calmness" and inaccurately asserted that appellant never told the
911 operator that he shot his brother:

 You know what that is? That's a man who had just murdered his brother
that didn't really know what to do about it, so he wants to act like an innocent
bystander that happened by. . . . What do you think he was doing? He didn't want
to admit it. He never did admit it. And the suggestion that, somehow, he told 9-1-1 that when they called him back, there's no evidence of that, whatsoever.

That statement is not true. Appellant did tell English during the second 911 call that he had shot
his brother, and that he did so in self-defense, but the State successfully objected to that
evidence. It created a false impression by successfully preventing appellant from offering this
evidence, and then it capitalized on and compounded the false impression at closing. This 
exclusion was error. However, we conclude that the error was not constitutional. 

2. The error was non-constitutional.

 As this Court explained in Potier, an erroneous ruling excluding evidence might rise to
the level of a constitutional violation if it effectively prevents the defendant from presenting
his defensive theory. (79) The erroneous ruling in this case did not have that effect. (80) Appellant was
not precluded from presenting a defense.

 At trial, appellant testified about the longstanding strife between Russell and himself.
He said that he never had good relationship with Russell. Russell pushed him through a
barbed-wire fence when he was ten. The first time Russell threatened him with a firearm was
years earlier when appellant took a friend to look at Russell's bird dogs. Appellant testified that
Russell "just got mad and told me he wanted me to leave, to get off his property, and he pulled
a gun on me." Some years later, Russell pulled a gun on him while appellant was sorting calves
and cows in the pasture. Russell was mad about appellant moving a fence: "he came out through
the gate there, and-and he said, 'You're just going to-some of these days, you're just going to
wish you hadn't crossed me' and pulled that [shot]gun on me." (81) Appellant testified that, after
the brothers' cattle partnership dissolved, he did not see Russell much. When he did, Russell
got mad because appellant wasn't paying rent. 

 Appellant then testified about shooting his brother. He said that he had pulled his truck
and buggy into the church parking lot because he had put on new brakes and magnets and he
wanted to see if they were working. He was going over to say hello to the pastor and his wife
when Russell pulled into the lot, got out of his truck, and came over to ask him why he hadn't
paid the water bill. Appellant said that he had paid it. Then Russell said, "Well, I know what kind
of joints you've been going into," and appellant responded, "I don't know what kind of joints
you're talking about. If you're talking about eating joints and banking joints and gasoline joints
and hair-cut joints . . . that's the only ones I know that I've been in." Russell then asked him
about the rent and appellant told him that that was between his mother and himself. 

 Appellant said that he started to leave and told Russell not to come asking for money.
But Russell, "as mad as the devil," told him, "I'm going to stop you today, once and for all."
Russell reached toward the door of appellant's truck. And as the door came open, appellant just
shot him. Appellant said he was afraid Russell would shoot him through the truck door. Appellant fully presented his self-defense theory when he testified. He does not contend
otherwise, but argues that he would not have testified at all but for the trial court's erroneous
exclusion of his 911 statements. That argument misses the point. Appellant was not compelled
to testify by the trial court's erroneous ruling. As the Seventh Circuit stated in an analogous
situation,

 the Supreme Court has held that there is no compulsion in such a case, since the
defendant has the option of refusing to testify and instead, if he is convicted, of
obtaining appellate correction of the erroneous evidentiary ruling and with it a
new trial. 

 This rule puts the defendant to a hard tactical choice. But the alternative
would be to give him two bites at the apple: testify, and try to win an acquittal; if
that fails, appeal and get a new trial on the basis of the judge's ruling. The
Supreme Court prefers the first of these unsatisfactory resolutions to the second,
and we are bound. (82)


 In this case, the erroneously excluded evidence was relevant to appellant's self-defense
theory, but its exclusion did not prevent him from presenting a defense. (83) Rather, this
testimony would have "incrementally" furthered appellant's defensive theory. (84) For this reason,
the error was not of constitutional dimension. 

IV. CONCLUSION

 We therefore vacate the judgment of the court of appeals and remand this case to that
court for further proceedings consistent with this opinion.

Delivered: December 5, 2007

Publish
1. Walters v. State, 206 S.W.3d 780, 783 (Tex. App.-Texarkana 2006) (citing Ellis v. State,
811 S.W.2d 99 (Tex. Crim. App. 1991)). 
2. Tex. R. App. Proc. 66.3(a) & (e). We granted review on the following grounds:

1. Was appellant's proposed jury instruction sufficiently specific to put the trial court on notice of
the particular issue that appellant was requesting to be submitted?

2. When a charge on self-defense is given, is a defendant entitled to a specific instruction that
threats the victim made to the defendant may be considered by the jury in determining the
reasonableness of the defendant's fear at the time he used deadly force?

3. When a recorded telephone conversation is admitted into evidence, does the rule of optional
completeness require the admission of any other recorded telephone conversation between the
same parties?

4. When the trial court incorrectly excludes a recording under TRE 107, is the error non-constitutional or does it deny the defendant his sixth amendment right to cross-examine and
violate his fifth amendment right not to testify when he subsequently is "forced" to testify in
order to get the substance of the excluded conversation before the jury?

We need not address the first ground because the SPA now concedes that appellant's proposed jury
instruction was sufficiently specific to preserve error.
3. "First Responder" units are volunteer units trained in basic life support; they are dispatched by
the county when a 911 call comes in, to augment the EMS system "until EMS can get there."
4. The requested instruction read as follows:


 You are instructed that where a defendant accused of murder seeks to justify himself on
the grounds of threats against his own life, he is permitted to introduce evidence of the
threats made, but the same shall not be regarded as affording justification for the offense
unless it be shown that at the time of the killing, the person killed, by some act then
done, manifested an intention to execute the threats so made and provided that a
reasonable person in the defendant's situation would not have retreated.
5. 811 S.W.2d 99 (Tex. Crim. App. 1991).
6. Id. at 101.
7. Id. In Ellis, we cited cases from 1929, 1948 and 1955, specifically Bazan v. State, 111
Tex. Crim. 320, 12 S.W.2d 788 (1929) (self-defense charge given was too narrow because it allowed
the jury to consider only the victim's acts and not his words which, when combined with those acts,
could have led defendant to fear for his life); Barkley v. State, 152 Tex. Crim. 376, 214 S.W.2d 287
(1948) (prior-verbal-threats instruction proper given the evidence of threats); and Bratton v. State,
161 Tex. Crim. 623, 279 S.W.2d 865 (1955) (error to submit a self-defense charge that did not
encompass the victim's threats).
8. Walters v. State, 206 S.W.3d 780, 784 (Tex. App.-- Texarkana 2006).
9. SPA's Brief at 8.
10. Giesberg v. State, 984 S.W.2d 245 (Tex. Crim. App. 1998).
11. Solomon v. State, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001).
12. SPA's Brief at 8.
13. SPA's Brief at 7.
14. Appellant's Brief at 7-8.
15. Appellant's Brief at 7.
16. Tex. Code Crim. Proc. art. 36.14. 
17. Tex. Pen. Code §§ 2.03, 2.04; Arnold v. State, 742 S.W.2d 10 (Tex.Crim.App. 1987).
18. Booth v. State, 679 S.W.2d 498 (Tex. Crim. App. 1984); Lugo v. State, 667 S.W.2d 144
(Tex. Crim. App. 1984); Warren v. State, 565 S.W.2d 931 (Tex. Crim. App. 1978).
19. 43 George E. Dix & Robert O. Dawson, Criminal Practice and Procedure § 36.42
at 580-81 (2001).
20. We cataloged the Legislature's intent in Willis v. State:

 The Legislature . . . enacted certain defenses to acts otherwise defined as crimes. In
Chapter Eight of the Texas Penal Code, the Legislature has created the "General
Defenses to Criminal Responsibility." Along with the Chapter Eight defenses, the
Legislature, in Chapter Nine, has defined certain conduct to be "justified" in particular
situations notwithstanding penal laws to the contrary. . . . Moreover, the Legislature
has, within certain particular penal provisions, defined certain defenses to conviction.

790 S.W.2d 307, 315 (Tex. Crim. App. 1990) (citations omitted). We explained that these defenses
are: Insanity, Mistake of Fact, Mistake of Law, Duress, and Entrapment. Id. at n.4; see also Tex.
Pen. Code §§ 8.01, 8.02, 8.03, 8.05, 8.06. Justifications include: Public Duty, Necessity,
Self-Defense, Deadly Force in Defense of a Person, Defense of a Third Person, and Protection of Life
or Health. Tex. Pen. Code §§ 9.21, 9.22, 9.33, 9.34. Other justifications relate to Protection of
Property, Law Enforcement, and Special Relationships. Tex. Pen. Code §§ 9.41-9.62. An example
of a penal provision defining a defense to conviction is found in Section 42.02, the "Riot" statute, where
subdivision (c) provides, "It is a defense to prosecution under this section that the assembly was at first
lawful and when one of those assembled manifested an intent to engage in conduct enumerated in
Subsection (a), the actor retired from the assembly." Tex. Penal Code § 42.02. 
21. Giesberg, 984 S.W.2d 245.
22. Id. at 250 (citations omitted).
23. Williams v. State, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982).
24. Sanders v. State, 707 S.W.2d 78, 81 (Tex. Crim. App. 1986).
25. Barnett v. State,709 S.W.2d 650, 652 (Tex. Crim. App. 1986).
26. Solomon v. State, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001).
27. Ortiz v. State, 93 S.W.3d 79, 92 (Tex. Crim. App. 2002). 
28. 530 S.W.2d 120 (Tex. Crim. App. 1975).
29. Id. at 122.
30. Id. at 122-23.
31. Id. at 123. In Ellis v. State, 811 S.W.2d 99 (Tex. Crim. App.1991), Judge Miller, joined
by three other judges, wrote a short concurring opinion referencing Young:

 I write to reiterate that the 1974 Penal Code sections relating to homicide have
not been construed as an exclusive codification of the law of homicide as it relates to
self-defense, right to arm one's self, etc. Young v. State, 530 S.W.2d 120 (Tex. Cr.
App. 1975).

 The charge requested in this case was sanctioned by pre-1974 cases as cited
by the majority opinion. Believing that this charge is contained within the ambit of those
pre-1974 common law jury instructions that also survived the "new" penal code, as
noted in Young, supra, I join the majority opinion.

Id. at 101-02 (Miller, J., concurring).
32. McGowan v. State, 188 S.W.3d 239, 242 (Tex. App.--Waco 2006, pet. ref'd) (following
Giesberg and holding, "For a case under the 1974 Penal Code, since the Legislature did not expressly
provide for it, no 'right to arm' instruction should be given."); Fonseca v. State, No.
04-03-00398-CR, 2004 Tex. App. LEXIS 9916, *10 (Tex. App.--San Antonio, Nov. 10, 2004,
pet. dism'd) (mem. op.) (holding that "pursuant to Giesberg, Fonseca was not entitled to a 'right to
arm' instruction"); Castaneda v. State, 28 S.W.3d 216, 226 (Tex. App.--El Paso 2000, pet. ref'd)
(noting that the defendant "has not shown, nor do we find, that 'right to arms,' 'right to shoot to scare,'
and 'right to pursue,' are defenses recognized by the Texas Penal Code. Accordingly, under Giesberg,
[the defendant] was not entitled to such instructions.").
33. This policy is reflected in Article 38.04 of the Code of Criminal Procedure, which provides
that:

 The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to
the testimony, except where it is provided by law that proof of any particular fact is to be taken
as either conclusive or presumptive proof of the existence of another fact, or where the law
directs that a certain degree of weight is to be attached to a certain species of evidence.

Tex. Code Crim. Proc. art. 38.04.
34. Brown v. State, 122 S.W.3d 794, 799 (Tex. Crim. App. 2003) ("Texas courts are
forbidden from instructing the jury on any presumption or evidentiary sufficiency rule that does not have
a statutory basis.").
35. For example, Texas Penal Code § 9.31 now provides that "[t]he actor's belief that the force
was immediately necessary as described by this subsection is presumed to be reasonable if the actor:

 (1) knew or had reason to believe that the person against whom the force was used: (A) unlawfully
and with force entered, or was attempting to enter unlawfully and with force, the actor's
occupied habitation, vehicle, or place of business or employment; (B) unlawfully and with force
removed, or was attempting to remove unlawfully and with force, the actor from the actor's
habitation, vehicle, or place of business or employment; or (C) was committing or attempting to
commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or
aggravated robbery;

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a
violation of a law or ordinance regulating traffic at the time the force was used."

Tex. Penal Code § 9.31(a) (Vernon 2007).

 Jury instructions on various statutory presumptions, when raised by the evidence, are
appropriate, even though they focus the jury's attention on certain evidence. The same can be said for
the instruction on the common-law doctrine of provocation which was codified in Section 9.31(b)(4) of
the Penal Code. 
36. In Bazan, supra note 7, we noted that Penal Code art. 1222 then provided that "[i]t must
reasonably appear by the acts or by words coupled with the acts of the person killed that it was the
purpose and intent of such person to commit one of the offenses . . . ." Bazan, 111 Tex. Crim. at 322,
12 S.W.2d at 789. And in a later case this Court noted that the requested jury instruction was nearly
"a copy" of then-existing Article 1258 of the Penal Code. Barkely, 152 Tex. Crim. at 384, 214
S.W.2d at 291. None of this language appears in the current penal code. 
37. The propriety of this common-law "apparent danger" jury instruction is not before us, but that
charge instructed the jury as follows:

 A person is justified in using force against another in self-defense when and to
the degree he reasonably believes the force is immediately necessary to protect himself
against the other's use or attempted use of unlawful force. It is not necessary that there
be an actual attack or attempted attack, a person is justified in using force against
another in self-defense from apparent danger to the same extent as he would be had the
danger been real, provided [that] he acted upon a reasonable belief that the other
person was using or attempting to use unlawful force, and that he reasonably believed
the use of force was immediately necessary to protect himself against the other person's
use or attempted use of unlawful force against him. Except, the use of force against
another is not justified in response to verbal provocation alone or if the actor provoked
the other's use or attempted use of unlawful force, unless the actor abandons the
encounter, or clearly communicates to the other his intent to do so reasonably believing
he cannot safely abandon the encounter; and the other nevertheless continues or
attempts to use unlawful force against the actor.

This instruction, regardless of whether it was statutorily authorized, amply addressed the issue of the
reasonableness of appellant's beliefs based upon his brother's prior threats. See generally Torres v.
State, 7 S.W.3d 712, 715 (Tex. App.-Houston [14th Dist.] 1999, pet. ref'd), relying on Jones v.
State, 544 S.W.2d 139 (Tex. Crim. App. 1976), to reject the State's argument the trial court's charge
to the jury on self-defense, which generally tracked the language of Section 9.31 of the Penal Code,
was sufficient to encompass apparent danger. In Jones we stated, 

 Where the evidence raises the issue of apparent danger, the court, in instructing the jury on the
law of self-defense, should tell it that a person has a right to defend from apparent danger to the
same extent as he would had the danger been real, provided he acted upon a reasonable
apprehension of danger as it appeared to him from his standpoint at the time.

544 S.W.2d at 142. Three years later, in Valentine v. State, 587 S.W.2d 399 (Tex. Crim. App.
1979), we held that an additional charge on apparent danger was not required, when, as part of its
charge on the law of self-defense, the court instructed the jury on the statutory definition of "reasonable
belief." Id. at 401. This had not happened in Jones. Id. In Valentine, we stated, "By defining the term
'reasonable belief' as it did, the court instructed the jury that a reasonable apprehension of danger,
whether it be actual or apparent, is all that is required before one is entitled to exercise the right of
self-defense against his adversary." Id. And we observed that "the court's charge is in accordance with
Sections 1.07 (31) [now §1.07(42)], 9.31, and 9.32 of the Penal Code, all of which adequately
presented the appellant's defensive theory and protected her rights." Id.; see also Lowe v. State, 211
S.W.3d 821, 825 (Tex. App.--Texarkana 2006, pet. ref'd) (following Valentine).
38. Walters, 206 S.W.3d at 783.
39. Id.
40. Tex. Pen. Code § 9.31(b)(1) ("The use of force against another is not justified . . . in
response to verbal provocation alone.").
41. 122 S.W.3d 794, 796 (Tex. Crim. App. 2003).
42. As we stated in Brown:

 In the Texas adversarial system, the judge is a neutral arbiter between the advocates;
he is the instructor in the law to the jury, but he is not involved in the fray. The
advocates have the task of producing the evidence, arguing its significance, and pointing
out the logical inferences that flow from that evidence. The jurors, meanwhile, are
primarily passive listeners who are supposed to remain open-minded until the evidence
is complete and the judge has given them the black-letter law in his written charge. "The
adversary theory maintains that the devotion of the participants, judge, juror and
advocate, each to a single function, leads to the fairest and most efficient resolution of
the dispute." 

122 S.W.3d at 797-99 (footnote and citations omitted).
43. See Tex. R. Evid. 103(a)(2).
44. Walters, 206 S.W.3d at 785. Justice Ross reasoned that

 Rule 107 was implicated in this case when English testified that he asked Walters if he
wanted to talk about what had happened. To then exclude Walters' response deprived
the jury of the remaining parts necessary to a full understanding of the evidence, in
violation of the rule of optional completeness. Walters' recorded response to English's
question was "necessary to fully and fairly explain a matter 'opened up; by the adverse
party." The absence of Walters' response made English's testimony incomplete.

Id. at 786 (citation omitted). 
45. Justice Ross stated,

 The State made Walters' state of mind a key issue in this case by focusing on Walters'
calm demeanor during the conversations with police. Walters' demeanor was so
presented to show that his actions were calmly intentional and premeditated. This focus
is apparent in the State's questioning of English concerning the second 9-1-1 call . . . .
English's testimony concerning his conversations with Walters consisted of the
declarations of two individuals as recounted by one participant, including only a portion
of the content, but describing Walters' demeanor. Walters sought to introduce a
recording of the entirety of those conversations, that would have included the remainder
of the content, and allowed the jury to determine for itself his demeanor without
filtration through a third party. This is the very purpose of the rule of optional
completeness.

Id. at 786-87.
46. Id. at 788. 
47. Id. at 787.
48. Id. at 788.
49. Id. at 789 (Carter, J., concurring) (citation omitted).
50. Id. at 790 (Carter, J., concurring).
51. SPA's Brief at 11.
52. Id. at 12.
53. Id.
54. Id. at 13.
55. Appellant's Brief at 10-11. We note that appellant asserts that because he did not offer the
recording for the truth of the words spoken, it was not hearsay. But if the second conversation did not
come in for its truth, appellant could not rely on it to raise self-defense.
56. Apolinar v. State, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005) (citing Zuliani v. State,
97 S.W.3d 589, 595 (Tex. Crim. App. 2003)).
57. Id. (citing Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)).
58. That rule provides, in part, that:

 When part of an act, declaration, conversation, writing or recorded statement is given in
evidence by one party, the whole on the same subject may be inquired into by the other, and
any other act, declaration, writing or recorded statement which is necessary to make it fully
understood or to explain the same may also be given in evidence, as when a letter is read, all
letters on the same subject between the same parties may be given.

Tex. R. Evid. 107.
59. Parr v. State, 557 S.W.2d 99, 102 (Tex. Crim. App. 1977) (stating that "[i]t is well
established that the evidence which is used to fully explain a matter opened up by the other party need
not be ordinarily admissible" under the common-law doctrine of optional completeness).
60. Cerda v. State, 557 S.W.2d 954, 957 (Tex. Crim. App. 1977). 
61. Sauceda v. State, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004) ("The plain language of
Rule 107 indicates that in order to be admitted under the rule, the omitted portion of the statement must
be 'on the same subject' and must be 'necessary to make it fully understood.'"); Allridge v. State, 762
S.W.2d 146, 153 (Tex. Crim. App. 1988) (defendant's self-serving hearsay confession was not
admissible under Rule 107 when the State offered a later confession which "did not mislead the jury or
leave the jury with only a partial or incomplete version of the facts").
62. Jernigan v. State, 589 S.W.2d 681, 694-95 (Tex. Crim. App. 1979) (when defendant
used a deposition to cross-examine a witness, Rule 107 did not permit State to offer entire deposition,
only the portions relating to the same subject raised during cross-examination); Araiza v. State, 929
S.W.2d 552, 555-56 (Tex. App.--San Antonio 1996, pet. ref'd) (although prosecutor questioned
witness about whether details in his written statement were made at the instruction of defendant,
prosecutor did not offer any portion of the statement itself, thus defendant was not entitled to offer the
entire statement under Rule 107); Pinkney v. State, 848 S.W.2d 363, 367 (Tex. App.--Houston [1st
Dist.] 1993, no pet.) (reading the phrase "I contacted" from an offense report did not invoke Rule
107).
63. Tex. R. Evid. 103(a).
64. See Carter v. Ferris, 93 S.W.2d 504, 507-08 (Tex. Civ. App.--Amarillo 1936, writ
dism'd) (stating that errors not prejudicial to the substantial rights of a party do not constitute prejudicial
error); Runnels Chevrolet Co. v. Clifton, 46 S.W.2d 426, 429 (Tex. Civ. App.--Beaumont 1932,
no writ) (reversible error must cause injury to the appellants).
65. Johnson v. State, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001); see King v. State, 953 S.W.2d
266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States, 328 U.S. 750 (1946)).
66. Rule 44.2 reads:

 (a) Constitutional Error. --If the appellate record in a criminal case reveals constitutional
error that is subject to harmless error review, the court of appeals must reverse a
judgment of conviction or punishment unless the court determines beyond a reasonable
doubt that the error did not contribute to the conviction or punishment.

 (b) Other Errors. --Any other error, defect, irregularity, or variance that does not affect
substantial rights must be disregarded.

Tex. R. App. P. 44.2.
67. 68 S.W.3d 657 (Tex. Crim. App. 2002).
68. Id. at 666.
69. Id. at 662-63.
70. Id. at 665. In Potier, the trial court erroneously excluded testimony of rumors that the
defendant and a neighbor had heard from people in his neighborhood that indicated that the victim
intended to kill the defendant on the day of the shooting. Id. at 658. We concluded that the error was
non-constitutional. Id. at 666. See also Valle v. State, 109 S.W.3d 500, 507 (Tex. Crim. App. 2003)
("The fact that appellant was not able to present his case in the form he desired does not amount to
constitutional error when he was not prevented from presenting the substance of his defense to the
jury.").
71. Wiley v. State, 74 S.W.3d 399, 406-07 (Tex. Crim. App. 2002) (trial court's ruling that
probative value of "alternative perpetrator" evidence was substantially outweighed by danger of unfair
prejudice was not a clearly erroneous exclusion of admissible evidence, thus defendant was not denied
his Sixth Amendment and due process rights to present a meaningful defense).
72. See supra note 66.
73. Johnson v. State, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001)
74. Id. at 4.
75. 206 S.W.3d 689 (Tex. Crim. App. 2006).
76. Id. at 697.
77. Id. 
78. The SPA compares the present situation to that in Sauceda v. State, 129 S.W.3d 116 (Tex.
Crim. App. 2004), in which we held that when a defendant asked a CPS worker one question for
impeachment purposes (whether the child victim mentioned a weapon in an interview), the State could
not then offer a videotape of the entire interview (which revealed extraneous offenses) under the rule of
optional completeness. Id. at 120-24. In Sauceda, we rejected the State's argument that opening a
small crack in the door would permit the State to fling that door wide open to the admission of the
entire videotape. Id. at 123. We held that the admission of the entire videotape was not necessary to
explain the witness's previous testimony concerning the child's failure to mention a weapon during their
interview or place it in the proper perspective. Id. 
79. Potier, 68 S.W.3d at 665.
80. Id. (noting the cases in which the Supreme Court has found that the erroneous rulings had a
drastic effect as Ferguson v. Georgia, 365 U.S. 570 (1961) (denial of defendant's right to testify
under oath and with the assistance of counsel), Washington v. Texas, 388 U.S. 14 (1967) (denial of
right to present vital evidence of a co-defendant), Chambers v. Mississippi, 410 U.S. 284 (1973)
(denial of right to present vital, reliable hearsay evidence, combined with denial of right to
cross-examine), and Rock v. Arkansas, 483 U.S. 44 (1987) (denial of the defendant's right to testify
to vital evidence about the offense)).
81. Jackie Ray Patrick corroborated appellant's testimony about Russell's two prior
confrontations. He testified that when they went to look at Russell's bird dogs, the brothers got in an
argument, "Russell went in his pickup and got a shotgun and told John if he didn't get off the place, he'd
shoot him." He then testified about a second confrontation he witnessed when he came to look at
appellant's cattle. The fight was over a fence. Patrick heard Russell say "John, I want you to move
that fence today." And John said, "Like hell I will." "And then Russell reached behind him and got the
- a pistol out and pointed it at him." Patrick testified that "Russell was shaking the gun, but then I saw
him cock the gun, and I knew that he meant business. And I stepped in front of him and John, and I
said 'Russell, it's not worth this.' I said, 'Your mother's in the house now.' And I said, 'Just let it go. 
This land is not worth it.'" Russell then lowered the pistol, and Patrick pushed John into the feed room. 
After that, Patrick "just quit doing business with appellant" because "I felt like I might have got killed
there."
82. United States v. Paladino, 401 F.3d 471, 477 (7th Cir. 2005) (citation omitted) (finding
non-constitutional error under the federal rule of optional completeness when the government presented
a severely cropped version of defendant's deposition to demonstrate guilty knowledge).
83. Potier, 68 S.W.3d at 666.
84. Ray v. State, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005).