

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NOS. 02-10-00288-CR
### 02-10-00289-CR

DEREK JASPER MOORE                                                 APPELLANT

V.

THE STATE OF TEXAS                                                       STATE

----------

## FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Derek Jasper Moore walked into the Good Luck convenience store in Arlington, brandished a handgun, and demanded that the owner empty the register. Approximately three weeks later, Appellant pursued Stephany Rodgers into that same store, poured orange juice on her head, followed her

---

[1]*See* Tex. R. App. P. 47.4.

back to her father's apartment, held a knife to her neck, and threatened to kill her.  A jury found Appellant guilty of aggravated robbery and aggravated assault with a deadly weapon.  Appellant now appeals those convictions, complaining in a single point that he was denied "proper impeachment" in the aggravated assault case.  We affirm.[2]

**Facts and Procedural Background**

On February 15, 2009, a video surveillance camera at the Good Luck convenience store in Arlington recorded Appellant committing aggravated robbery.  After retrieving a beer from the cooler, setting it on the counter, and stepping outside momentarily, he returned with a handgun and demanded that the store owner empty the register.  The owner complied, Appellant said "thank you" and left.

On March 9, 2009, Stephany Rodgers was scheduled to begin classes toward her advanced medical assistant certificate.  She and Appellant had a child

---

[2]Appellant pleaded guilty to aggravated robbery and not guilty to aggravated assault.  The jury found him guilty of both, and the trial court set punishment at concurrent sentences of forty five years' and ten years' confinement, respectively.  Appellant filed notices of appeal in both cases and asks us to reverse the "convictions."  His sole issue on appeal, however, relates only to the aggravated assault case, and despite conclusorily averring that the alleged error affected punishments in "both causes," he does not suggest how that might be true.  Accordingly, we consider only the aggravated assault case and affirm the trial court's judgment in the aggravated robbery.  *See* Tex. R. App. P. 38.1(i), 43.2(a); *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005), *cert. denied*, 548 U.S. 926 (2006); *Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 1053 (2001); *Mosley v. State*, 983 S.W.2d 249, 256 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

2

together, and Stephany had arranged for Appellant to watch the little girl while Stephany attended class. Appellant had not answered Stephany's calls the night before, so on the morning of the ninth she went looking for him.

When she caught up with him at his "homeboy's house," they got into an argument that escalated to blows. The altercation continued during and after Stephany drove them in her father's car: Stephany pushed Appellant; he punched her in the face, jumped up and down on the hood of the car, and pushed her over a barbeque grill, causing her to sprain her ankle.

The Good Luck convenience store was around the corner from Stephany's father's apartment, which Stephany house-sat from time to time. In the street near the apartment, she abandoned her father's car and set off for the store on foot, thinking that Appellant would not follow her into a place he had robbed just three weeks before. As she walked in, she told store owner Thanh Lien that her boyfriend had hit her, and she asked to use the telephone to call her mother. When Appellant entered the store and hurled a bottle of orange juice at Stephany, Lien recognized him from the earlier robbery.

Stephany and Appellant argued their way back to her father's apartment. She was crying and covered in orange juice, and Appellant ordered her to take a shower. As she did, she could hear Appellant ransacking the apartment. When she came out of the bathroom, she sat on the bed and told him that they should stop fighting one another before one of them ended up dead. He held a knife to her throat, threatened to cut her from "ear to ear," and replied, "It might be you."

3

There was a knock at the front door of the two-story apartment. Stephany started down the stairs to answer it but Appellant pushed past her, forcing her down on the steps.

Arlington police officer Sonia Mitchell[3] had been dispatched to investigate a disturbance call at the apartment complex. Shortly after she arrived, she was joined by Officer Alexander Simmons who pulled up to assist.

The officers noticed an abandoned gold Ford Explorer in the middle of the street with the driver's side door open, the lights on, and extensive damage to the hood. As they approached the apartment, they were stopped by two people who reported that there was a male and female arguing. At the apartment door, the officers heard a male voice yelling inside and also heard what sounded like items being thrown against a wall.

Officer Mitchell knocked on the door, and Appellant opened it. Inside, the officers found the apartment in disarray: things were broken and strewn across the floor; a knife protruded from the wall, and there was crying upstairs. The officers asked Appellant to step outside and stay with Officer Simmons. Officer Mitchell climbed the stairs and saw Stephany, crying loudly, shaking, and sitting on the edge of the bed wrapped in a towel.

---

[3]By the time she testified at Appellant's trial, Officer Mitchell's last name had changed to Villanueva, and she had been promoted to detective.

4

Officer Mitchell immediately noticed a small cut on Stephany's neck.  She asked Stephany if she was hurt and needed medical attention.  Stephany told her that she was hurt and showed Officer Mitchell her injuries, but she did not seem to want to elaborate on how she got them.  When Officer Mitchell pointed out the cut on Stephany's neck, Stephany said that she had been unaware of it up to that point but that it must have happened when Appellant held the knife to her neck.

Downstairs, a hostile Appellant argued with Officer Simmons, who was trying to convince him to identify himself.  Appellant said that he did not need to identify himself and that he was not going to go to jail.  Officer Mitchell headed back downstairs and informed Officer Simmons that they had enough information to make an arrest.  Appellant resisted, but the officers were able to handcuff him and take him into custody.  While the officers struggled with Appellant, Stephany pleaded from upstairs for them not to arrest him.

After the officers escorted Appellant to a patrol car, Officer Mitchell went back upstairs to talk to Stephany, who was still arguing against the officers' taking Appellant to jail.  Officer Mitchell asked her what had made her so significantly change positions, and she replied that she was afraid that Appellant would kill her or have her killed or beaten up and that he would be able to do so even from prison.  She did not want to take any part in the prosecution.

Appellant's telephone calls from jail were recorded.  In one conversation with Stephany, he demanded to know why she had told the police about him holding a knife to her neck.  She did not want to admit to him that she had talked

5

about the knife, so she lied, saying that the police had tested the knife and had found her blood on it.  He complained that as a result he was going to "be doing a couple of years" and that she needed to "change that."

At trial, Appellant's investigator, Francis Fry, testified outside the jury's presence that during a telephone conversation with Stephany around June 19, 2009, Stephany recounted the assault but did not mention anything about Appellant's using or exhibiting a knife.  Fry also admitted, however, that he did not ask her about the knife.  Earlier in the trial, Stephany had testified that she did not remember the conversation or even that Fry had called her, but she guessed that she did not say anything to him about the knife.

### No Error to Exclude What She Didn't Say When She Wasn't Asked

In his sole point, Appellant complains that the trial court denied him his state and federal rights to confront and effectively cross-examine Stephany by preventing him from properly impeaching her, apparently through the testimony of his investigator, Francis Fry.  Specifically, he appears to argue that the trial court erred by excluding Fry's testimony that Stephany did not tell Fry about the knife during a telephone conversation in June of 2009.  Appellant now contends—though he did not before the trial court—that the exclusion of this proffered testimony violated his state and federal constitutional rights to confront and cross-examine witnesses.

While Appellant now complains that the trial court's ruling denied his federal and state constitutional rights, at trial he mentioned neither the state nor

6

federal constitutions, any of their clauses pertaining to confrontation or cross-examination of witnesses, or any cases interpreting those provisions, such as *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004).  Accordingly, we hold that Appellant failed to preserve a constitutional complaint for our review. *See* Tex. R. App. P. 33.1(a)(1); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis for the complaint raised on appeal varies from the complaint made at trial."); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (holding that objection that could encompass complaints under either the evidentiary rules or the Confrontation Clause is insufficiently specific and that hearsay objection does not preserve constitutional complaint).

From the record at trial, it appears that Appellant stood on rule of evidence 613 as grounds for presenting testimony from Fry in front of the jury that Stephany never mentioned during their June 2009 telephone conversation that Appellant had used a knife against her.

Although Appellant does not raise this for our consideration, it is a general rule of evidence that the prior silence of a witness as to a fact to which he has testified, where such silence occurred under circumstances in which he would be expected to speak out, may be used to impeach the witness.  *Cisneros v. State*, 692 S.W.2d 78, 83 (Tex. Crim. App. 1985); *see Franklin v. State*, 606 S.W.2d 818, 848 (Tex. Crim. App. 1979) (op. on reh'g).  But "[m]erely having the

opportunity to say something does not constitute circumstances in which one would be expected to speak out." *Franklin*, 606 S.W.2d at 848.

As we said, however, Appellant does not argue this issue, and we are disinclined to argue it for him. Moreover, even if we were to hold that Stephany's silence to Fry on the issue of whether Appellant had used a knife was inconsistent with her subsequent testimony at trial that he did in fact use a knife, we fail to see how Appellant was harmed. First of all, Stephany conceded to the jury during cross-examination that she did not tell Fry about the knife:

> Q. [by Defense Counsel] Now, you didn't mention anything about that knife or the other knife to Mr. Fry when you talked to him on June the 19th, did you?

> A. I guess not. I don't remember the conversation that we had.

Second, even if she did not tell an investigator working for Appellant about the knife months after the offense, the evidence shows that she had already told law enforcement about it on the day of the offense. The officer who saw Stephany on the day of the offense testified that she immediately noticed a small cut on her neck that Stephany evidently did not even realize was there but which she then reported to the officer must have been caused by Appellant's holding the knife to her neck.

Third, the jury heard Appellant in a recorded jail-phone conversation chastise Stephany for telling the police about the knife and urging her to drop the charges.

8

Fourth, the evidence showed that Stephany was a reticent witness. She completed an affidavit of nonprosecution, and she had to be subpoenaed to testify against Appellant. On the day of the offense, she was very reluctant to tell Officer Mitchell about her injuries, and she told the officer that she was afraid that Appellant would retaliate against her if she pursued his prosecution.

The exclusion of Fry's testimony did not prevent disclosure of the same information through Stephany's admission that she "guessed" she did not tell Fry about the knife. The exclusion of evidence in violation of the rules of evidence generally is nonconstitutional error reviewable under rule 44.2(b). Tex. R. App. P. 44.2(b); *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Under that rule, we must disregard nonconstitutional error that has no effect on an appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley*, 983 S.W.2d at 259; *Svitak v. State*, No. 02-07-00382-CR, 2009 WL 279462, at *4 (Tex. App.—Fort Worth Feb. 5, 2009, no pet.) (mem. op., not designated for publication). Given the evidence presented at trial, even if we were to assume for the sake of argument that the trial court erred when it excluded the additional fact that Stephany did not volunteer to Fry that Appellant had used a knife—particularly when Fry admitted that he did not ask her about it—we would hold that the exclusion of that testimony would have had no effect on the jury's consideration of the case and thus no effect on Appellant's substantial rights. Accordingly, we overrule Appellant's sole point.

**Conclusion**

Having overruled Appellant's sole point, we affirm the judgments of the trial court.


LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 12, 2012