

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-05-00014-CR
_____

JOHN ARLIN WALTERS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th Judicial District Court
Hopkins County, Texas
Trial Court No. 0417442

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

O P I N I O N

Brothers John Arlin Walters and Russell Walters had engaged in a decades-long battle over perceived entitlements to family property and feelings of maternal preference. That battle ended when John shot and killed Russell in a church parking lot in rural Hopkins County.

There has never been any question that John killed his brother. The pivotal question the jury needed to answer in determining John's guilt or innocence was whether John acted in self-defense.[1] The jury found that John had not acted in self-defense, was therefore guilty of murder, and should spend thirty-two years in prison as a result. The legal problem that has persisted through subsequent appeals is the exclusion of the recording of a telephone conversation with John, initiated by sheriff's deputy Sean English shortly after the shooting.

Most recently, the Texas Court of Criminal Appeals has ruled that the recording of English's call to John should have been admitted into evidence and has remanded the case to this Court for a harm analysis. Because we hold that the error was harmful, we reverse Walters' conviction and remand this case to the trial court for a new trial.

English's call to John was not the only call that day. Three 9-1-1 calls were received at the sheriff's office the day of the shooting in addition to the one call English initiated, which followed the three incoming 9-1-1 calls. Understanding the other three calls is helpful to an understanding of English's call to John.

---

[1]A jury found John guilty and assessed punishment at thirty-two years' imprisonment.

The first 9-1-1 call, received at 2:06 p.m., was from an unidentified female calling from the church about "some type of disturbance."  English dispatched an officer to the area.  At 2:08 p.m., English received the second 9-1-1 call with regard to the situation at the church.  This call was from a then-unidentified male at John's residence who informed English that "[a] man has been shot at the . . . church."  After the second call, English dispatched emergency medical services' personnel and other officers to the scene.  The third 9-1-1 call was received at 2:13 p.m. from a cell phone user identified as Carolyn Mobley.  This caller advised she was at the church parking lot with the shooting victim, whom she identified as "Russell Walters."  She further advised that "John Walters" was the shooter and that he had gone to his residence.  Mobley described the location of that residence, which was nearby.  English advised the officers of this information, and two units went to Walters' residence.

After English testified about the three incoming 9-1-1 calls, the State offered its Exhibit number 1, a Compact Disc on which those three calls were recorded.  Walters objected on the ground of hearsay, but the objection was overruled and the recording of the three 9-1-1 calls was played for the jury.

English then testified that, after the three 9-1-1 calls, at approximately 2:25 p.m., he placed a telephone call to the "John Walters residence," from which he had received the second 9-1-1 call. English testified that the male who answered the telephone identified himself as John Walters and that it seemed to be the same person who made the second 9-1-1 call.  English said he asked John

3

if he wanted to talk about what had happened. The State interrupted English and proceeded to question him about what was said to John concerning the firearm used in the shooting. English testified he told Walters to unload the firearm and put it away. He also said he told Walters the officers were outside his house and for him to "come out with his hands up where the officers could see them." English quoted Walters as saying, "he'd hang the phone up, and he'd be right out." This telephone conversation between English and Walters was also recorded at the sheriff's office.

On cross-examination, English reiterated that, after the three 9-1-1 calls, he telephoned Walters and asked him if he wanted to talk about what had happened. However, when Walters' counsel asked English what Walters had said in response, the State objected on the ground of hearsay. The trial court sustained the objection.

As quoted by the Texas Court of Criminal Appeals, the relevant part of that unadmitted telephone conversation is as follows:

Hello.

Hey John.

Yes.

Hey this is Sean over here at the Sheriff's office.

Yeah.

What's happening man?

My brother come over here threatening me, one of several times.

Did he?

Yep.

Allright.

He told me one time he was gonna kill me out there at the barn.

Oh Really.

Yep.

Allright John, everything's gonna be okay?

Yep.

Uh, Are you inside your house right now?

Yes sir, I am inside my house right now.  I'm the one that called 911.

*Walters v. State*, 247 S.W.3d 204, 215 (Tex. Crim. App. 2007).

John's counsel wanted to question English about this dialogue or to play the recording of the whole call, based on the following testimony elicited by the State:

[The State]:    I want to talk to you specifically about the second 9-1-1 call that came from the suspect, John Walters', residence.  From that phone call, was there any indication, during that call, as to that the person calling was the person that did the shooting?

[English]:    Not at that time, no.

Q.    Was there anything that would suggest that during that call?

A.    No, sir.

5

Q. All right. And would you classify the emotional state of that particular caller as being excited?

A. No, sir.

Q. What would you characterize it as being during that call?

A. Calm.

. . . .

Q. . . . From your experience as being a dispatcher for three years, have you ever received calls like this before with regards to incidents?

A. Like this before?

Q. Yeah.

A. No, sir.

Q. Where just somebody would call and say, "Hey, somebody's been shot"?

A. No, sir, not exactly in those words.

Q. All right. Seemed to be a little out of the ordinary?

A. A little bit.

Q. What would you have expected?

A. Somebody very excited, shaky, even, maybe.

Q. Did you get that here on this 9-1-1 call?

A. No, sir.

*Walters v. State*, 206 S.W.3d 780, 786–87 (Tex. App.—Texarkana 2006), *rev'd & remanded*, 247 S.W.3d 204 (Tex. Crim. App. 2007).

The Texas Court of Criminal Appeals concluded that, after the State introduced the recordings of the three incoming 9-1-1 calls and testimony from English about the outgoing call, the trial court erred in declining to admit the recording of the outgoing call into evidence. The Texas Court of Criminal Appeals concluded that the State had opened the door to the admission of the call to correct a false impression that it had created and then emphasized during arguments: that John had not admitted, nor explained why, he shot Russell. *Walters*, 247 S.W.3d at 220.

The Texas Court of Criminal Appeals focused on the false impression left by the State, and then concentrated its attention on the State's final argument, in which it stated that Walters did not want to admit to shooting his brother, that he never did admit it, and that "the suggestion that, somehow, he told 9-1-1 that when they called him back, there's no evidence of that, whatsoever."

Of course, as the Texas Court of Criminal Appeals said, that claim was untrue, because John did tell English during the call that he had shot his brother and that he had done so in self-defense, but the State first prevented John from offering that evidence and then capitalized on and compounded the false impression during its closing argument. That court concluded that the evidence should have been admitted and that the error was not constitutional error, but merely statutory. The case has been returned to us to do a harm analysis.

The sole issue before this Court is whether the error in excluding the evidence of English's call to John is harmful, using the substantial harm analysis of Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(b).

When evaluating harm from nonconstitutional error flowing from the exclusion of relevant evidence, we examine the record as a whole, and if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless. *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). The question before us is whether we have fair assurance that the exclusion of the evidence did not influence the jury or had but a slight effect. *See Johnson v. State*, 967 S.W.2d 410 (Tex. Crim. App. 1998).

As discussed in detail by the Texas Court of Criminal Appeals:

> The record shows that the State's questioning of Officer English and Beth Hankins left the jury with the impression, later emphasized during closing arguments, that appellant had not given any explanation of the shooting immediately after the event. Officer English testified that he asked appellant if he wanted to talk about what had happened. That question hovered in the air, but the State cut the witness off and redirected him to other matters. The jury did not hear that, from the very beginning, appellant told officers that he shot his brother in self-defense. Appellant's words to Officer English were: "My brother come over here threatening me, one of several times," and "He told me one time he was gonna kill me out there at the barn." The State played the initial 911 call three times for the jury. During closing argument, it harped on appellant's preternatural "calmness" and inaccurately asserted that appellant never told the 911 operator that he shot his brother:
>
> > You know what that is? That's a man who had just murdered his brother that didn't really know what to do about it, so he wants to act like an innocent bystander that happened by. . . . What do you think

8

> he was doing? He didn't want to admit it. He never did admit it.
> And the suggestion that, somehow, he told 9-1-1 that when they
> called him back, there's no evidence of that, whatsoever.
>
> . . . .
>
> Appellant did tell English during the second 911 call that he had shot his brother, and
> that he did so in self-defense, but the State successfully objected to that evidence. It
> created a false impression by successfully preventing appellant from offering this
> evidence, and then it capitalized on and compounded the false impression at closing.
> This exclusion was error.

*Walters*, 247 S.W.3d at 220–21.

We structure our analysis as set out by the Texas Court of Criminal Appeals in *Ray*, 178

S.W.3d 833. That opinion reversed this Court in a case in which we found insufficient harm and the

Texas Court of Criminal Appeals found otherwise. In *Ray v. State*, 148 S.W.3d 218, 226–27 (Tex.

App.—Texarkana 2004), *rev'd*, 178 S.W.3d 833 (Tex. Crim. App. 2005), the majority of this Court

concluded that the exclusion of testimony was not substantially harmful because the defendant was

able to get her defensive theory before the jury even absent the testimony and that it "would not have

added significantly to Ray's defense." The Texas Court of Criminal Appeals reversed our decision

on that point and remanded the case for a new trial. In its *Ray* opinion, the Texas Court of Criminal

Appeals focused the appropriate harm analysis:

> A review of the record as a whole reveals that the question of possession was not
> only the most important issue in the case, it was the only contested issue in the case.
> Appellant was prejudiced because she was precluded from presenting third-party
> witness testimony which would have corroborated and given independent credibility
> to the defense she sought to establish. Because appellant's only argument was that
> she did not possess the drugs, and the State's case rested on a contrary argument, the
> erroneous exclusion of testimony that tended to establish possession in another was

9

a "serious" error. . . . However, as Justice Carter points out [in his concurring opinion], this [whether it would have added significantly to Ray's defense] was an issue for the jury to decide--not the court of appeals. As the jury did not have the benefit of the third-party testimony upon the most critical element the State had the burden to prove, we cannot say with fair assurance that the error did not influence the jury or had but a slight effect.

*See Ray*, 178 S.W.3d at 836.

Similarly, the question of self-defense was the only contested issue in this case. John was precluded from presenting relevant evidence that was nearly contemporaneous with the shooting. It was evidence that thus would have provided a separate and different level of independent credibility to the only defensive theory raised.

John argues that it was harmful to let stand the false impression that he was a cool, calm killer who had refused to admit to the shooting and that he offered no explanation until trial. He also points out that the Texas Court of Criminal Appeals did not disagree with language in this Court's opinion stating that this evidence would have had the effect of altering the jury's impression of John, his demeanor, and the information he gave, and also noting that defense counsel could not effectively cross-examine Hankins and English about their conclusions about John's state of mind and behavior without that evidence.

The State responds by arguing that the error was harmless because the information was before the jury from a different source and that, even in combination with the State's jury argument, the error cannot be said to have caused John substantial harm. The State also argues that the evidence was of such strength that, essentially, no matter what errors existed, harm cannot be shown,

because the overwhelming weight of the evidence supported the jury's finding that he did not act in self-defense. *See Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002) ("overwhelming evidence" is factor to be considered in assessing harm under subdivisions (a) and (b) of Rule 44.2).

We do not find the State's claimed "overwhelming evidence." The only issue for the jury was whether John acted in self-defense based on apparent danger, not whether he shot the victim. The evidence consists of testimony that one of the shots struck Russell in the back and John's lack of suitable reaction to the shooting as the State argued should be expected—i.e., that Walters was calm, cool, collected, and did not show the expected mental and emotional fear. The State also suggests that, because no weapon was found on Russell's body, John could not have perceived he was in danger. That is a question for a jury to answer and is not a conclusion that is shown by overwhelming evidence by these facts. It is the error's effect and not the existence of overwhelming evidence or the lack thereof that dictates our judgment. *Orona v. State*, 791 S.W.2d 125, 130 (Tex. Crim. App. 1990).

Also factoring into the harm analysis is evidence from another source, Hankins, a registered nurse and "First Responder" who tended to Russell after the shooting. Based on her review in open court of the first 9-1-1 call, she described John as "not in shock, not shut down, and just matter of fact." *Walters*, 247 S.W.3d at 215.

11

The State suggests that it did not emphasize the result of the evidence being excluded. The Texas Court of Criminal Appeals, and we, disagree. The State both emphasized the "lack" of evidence and used it as a springboard for making other statements in jury argument.

John's entire defense was premised on the preexisting bad relationship between the brothers, the past violent or threatening behavior by Russell, and John's resulting reasonable fear of attack by Russell. That defense acquires whatever believability it may have based in substantial part on John's behavior and state of mind at or near the time of the shooting. In any murder prosecution, the defendant's trial testimony is suspect because time has elapsed, creating both opportunity and time to concoct a self-serving story. Thus, John's statements to English at or near the time of the incident would likely have a higher level of credibility or persuasive effect on the jury. This was implicitly acknowledged not just by the Texas Court of Criminal Appeals, but also by the State, which made great effort both to get the three incoming 9-1-1 conversations into evidence and which it played three times for the jury, and to keep this outgoing 9-1-1 conversation out. *See Ray*, 178 S.W.3d at 836.

Neither the record nor the State suggest any other method by which Walters might have provided any underpinning to his defensive argument—that his actions were not premeditated or calmly and coolly taken—than either the excluded evidence or his own testimony. Of the two, the excluded evidence is the more credible and influential. Further, neither the record nor the State suggest any other method of providing Walters with a basis for confronting and adequately

12

cross-examining English and Hankins about their opinions of John's mental or emotional state as shown by the recording.

As a result of the error, the jury had no opportunity to hear the recording, the best evidence from which John's vocal inflections, tone of voice, and reactions could be gleaned. Thus, harm is apparent.

We are hard-pressed to distinguish the harm analysis in this case from that issued by the Texas Court of Criminal Appeals in *Ray*. We cannot say with fair assurance that the error did not influence the jury or had but a slight effect. *See* TEX. R. APP. P. 44.2(b).

We reverse Walters' conviction and remand this case to the trial court for a new trial.

Josh R. Morriss, III
Chief Justice

Date Submitted:     October 29, 2008
Date Decided:       December 12, 2008

Publish

13