In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00163-CR
_____

**SAMUEL CECIL SANCHEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B170122-R**

**MEMORANDUM OPINION**

Samuel Cecil Sanchez was convicted of Aggravated Assault with a Deadly Weapon and, after he pled true to an enhancement, he was sentenced to eighteen years confinement in the Texas Department of Criminal Justice. *See* Tex. Penal Code Ann. §§ 22.01, 22.02(a)(2).[1] In two issues on appeal, Sanchez argues (1) that the

---

[1] We cite to the current version of the statutes because the amendments do not affect the disposition of this appeal.

1

evidence is legally and factually insufficient to support his conviction, and (2) the jury charge failed to comply with the statutory definition of "deadly force self-defense." We affirm.

## I. Background

Evidence is undisputed that in the early evening hours of August 6, 2016, B.G., his family, and several friends returned to a boat ramp in Orange County after a day on the water in his brother's boat.[2] Testimony is also undisputed that Sanchez arrived at the boat ramp at the same time in a separate boat.

B.G testified that his wife, his brother, his elderly disabled sister, and three friends were attempting to disembark and trailer their boat when Sanchez, along with another male passenger, arrived at the boat ramp. The group was unloading gear into an SUV parked next to their boat slip, as B.G., B.G.'s brother, and a friend, C.N., trailered the boat. According to B.G., he was still in the boat with C.N. when Sanchez walked by the boat and said, "I can't see how . . . that truck is going to pull out with y'all two fat asses in it." B.G. testified that he had never met Sanchez and was baffled as to why Sanchez would say this to them. Sanchez's comments upset B.G., but he

---

[2] We refer to the victim and his family members by their initials to conceal their identities. *See* Tex. Const. art. I, § 30(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]").

continued to unload his brother's boat as Sanchez backed a boat trailer into another boat slip to load his own boat. B.G. stated he was aggravated, but not "really mad" after Sanchez's statement.

After Sanchez backed his boat trailer into the water, B.G. walked over to Sanchez to ask him about his comment. B.G. stated that his brother and C.N. followed him to the boat ramp to talk to Sanchez. As B.G. approached, Sanchez was standing next to his truck on the incline of the boat ramp with his boat trailer in the water. B.G. and Sanchez exchanged greetings and shook hands and Sanchez asked him, "Well, what's up, big daddy?" According to B.G., as they were shaking hands, B.G.'s wife walked up beside B.G., and when B.G. turned to look at his wife, Sanchez hit him. When Sanchez struck B.G., it knocked B.G.'s hat and sunglasses into Sanchez's truck bed, and B.G. fell to the ground. A commotion started, and B.G. testified that he did not see anything else until after he got up from the ground. B.G. was unsure if he punched at Sanchez after Sanchez hit him but asserted that he never felt another punch from Sanchez. Bystanders at the boat ramp ran over and broke up the fight, and Sanchez left the boat ramp. After the fight ended, B.G. discovered that he had been stabbed in his neck and was bleeding. According to B.G., he never threatened Sanchez, did not hear anyone else threaten Sanchez, did not have a

weapon when he talked to Sanchez, and insisted that he "wasn't going down there to start . . . trouble."

B.G.'s brother testified that as he was loading the boat onto the boat trailer, he heard Sanchez say "[w]ell, how is that truck going to pull you two fat asses out and the boat, too[.]" The brother ignored the comment and continued to load his boat on the trailer. B.G.'s brother stated that as he was tying down his boat and helping to load the car, he heard "a big commotion . . . a lot of loud talking, hollering, and cussing" from a boat located next to him. The brother then walked over to the commotion, followed by C.N. He observed B.G. and Sanchez engaged in an argument "hollering and cussing at each other[.]" He believed that the situation had calmed down because he witnessed Sanchez and B.G. shake hands, when suddenly, Sanchez hit B.G. The brother said that B.G. fell after Sanchez hit him and Sanchez jumped on B.G.'s back. He then heard someone scream "[k]nife, knife" and saw Sanchez stab B.G. The brother stated that Sanchez then threw something into the water.[3] He testified that he did not threaten Sanchez and that he was "shock[ed]" by the attack because it appeared that B.G. and Sanchez were shaking hands, and each agreed to go their own way. He could not recall if B.G. threatened Sanchez but stated

---

[3] Testimony at trial established that a Blackwater diver was able to retrieve a black folding knife from the boat ramp but testing on the knife proved inconclusive.

4

that his group did not have any weapons. During cross examination, the brother stated that he did not hear Sanchez say that he was kidding after the comment, and he took Sanchez's tone as "threatening."

C.N. testified that he is friends with B.G., and he and his wife were on the boat that day with B.G. and his family. He stated that when the group arrived at the boat ramp, he and B.G. stayed in the boat with B.G.'s brother, while his wife and B.G.'s wife unloaded the boat. While they were on the boat, Sanchez walked by. Sanchez stared at them and made a comment that the "truck's not going to pull that boat out of the water with . . . two fat asses sitting on it." In response, both he and B.G. cursed at Sanchez. C.N. testified that he heard Sanchez say "I'm just messing with y'all" as he walked away. He also noticed that Sanchez staggered as he walked to get his truck. C.N. told B.G. to forget about Sanchez, and they continued to unload the boat.

After Sanchez backed his boat trailer into the water, C.N. observed B.G. walk towards Sanchez. C.N. followed B.G. because he was "not going to leave him there." C.N. stated that he did not speak to Sanchez, and he observed B.G.'s brother approach Sanchez as well. C.N. heard B.G. ask Sanchez "[w]hat'd you say back there[,]" and Sanchez replied, "[h]ey big daddy [,w]here are you from?" B.G. responded that he was from "Orangefield" and Sanchez stated, "Well, you ain't in

5

Orangefield." Sanchez then looked at each of them and said, "You know what? I'll fight all three of you. F you, F you, F you." Sanchez hit B.G. in his left eye, and B.G.'s head hit Sanchez's truck. C.N. was certain Sanchez hit B.G. first, but he was not sure if B.G. hit Sanchez. C.N. stated that Sanchez hit both B.G.'s brother and wife during the fight. After Sanchez hit B.G., C.N. heard a girl scream that Sanchez had a knife. C.N. then punched Sanchez's boat passenger as he approached the fight. As a result, he did not see Sanchez hit B.G. a second time. C.N. could not recall if B.G. threatened Sanchez when he approached him but testified, they did not have weapons, and he and B.G.'s brother did not threaten Sanchez. C.N. testified that he heard a bystander say that Sanchez tossed a knife into the water and observed a gash on B.G.'s neck.

B.G.'s wife testified that she was out of the boat helping B.G.'s elderly sister into a car when Sanchez pulled his boat into the next boat slip. She stated B.G. and C.N. were still in the boat when Sanchez walked by and said "[t]hat boat ain't coming out of the water with your two fat asses still in it." When Sanchez walked by her car, she noticed that he had two knives, "one on each hip." She described the knife for the jury. After Sanchez backed his truck and boat trailer into the adjoining boat slip, she then saw B.G. walk over to Sanchez and shake hands. She followed B.G. when he went toward Sanchez. Sanchez asked B.G. where he was from, and

6

B.G. replied "Orangefield." Sanchez then told B.G. "You're not in Orangefield anymore, . . . [t]his is my territory now." She testified the exchange upset her, and she cursed at Sanchez. She stated that "all of a sudden" Sanchez hit B.G., and B.G.'s sunglasses and hat flew into the bed of Sanchez's truck. B.G. lost his footing, and he slipped in the water of the boat ramp. As she reached down to help B.G., she was hit by Sanchez in her head and ribs. She then heard a "click" that she recognized as the sound of a knife opening. B.G.'s wife immediately started screaming "[h]e has a knife[,] [w]e need to go, [h]e has a knife." She testified that Sanchez had the knife in his hand, but she did not see Sanchez stab B.G.

C.N's wife testified that she was loading the car when C.N. and B.G. were on the boat. She stated that C.N. told her Sanchez had made a comment that "[the] truck ain't going to pull you two fat asses . . . and that pontoon out of there[.]" After Sanchez backed his truck and boat trailer into the boat slip, C.N.'s wife saw B.G. approach Sanchez, and she told C.N. to follow B.G. She then observed Sanchez and B.G. shake hands and introduce themselves. According to C.N.'s wife, C.N. was standing with B.G. and was "listening," and B.G.'s brother approached and stood by Sanchez and B.G. She admitted that she did not hear the conversation between Sanchez and B.G. but could tell that they were "talking loudly and arguing." She then noticed that B.G.'s wife approached the group and that his wife attempted to

7

get B.G. to go back to the car. C.N.'s wife heard Sanchez ask B.G. where he was from and tell B.G. "[w]ell, you're not in Orange[,] [y]ou're in West Orange" which she perceived as a "threat." She then heard Sanchez tell B.G., B.G.'s brother, and C.N., "[f] you, [f] you, [f] you. I'll fight all of you" and saw Sanchez immediately hit B.G., knocking B.G. down. Sanchez then hit B.G.'s brother. She did not see B.G. get stabbed but did see Sanchez hit B.G. in the area where he was stabbed. She testified that although she did not observe Sanchez with a knife during the fight, she had seen that Sanchez had two knives on his shorts before the fight. During cross examination, C.N.'s wife clarified her earlier statement that she did not observe B.G. hit Sanchez but "assumed [B.G.] hit him because of how he fell forward." She also testified that B.G. was upset when he approached Sanchez.

Two bystander witnesses also testified at trial. J.R. stated that she was at the boat ramp with her family on the day of the incident. J.R. recorded a video of the fight that was admitted at trial, including photographic stills from the video. J.R. testified that she heard Sanchez walk by the boat with B.G. and make a comment about "fat asses." She stated that she started to record when she noticed "everybody . . . walking over there to speak to [Sanchez]." J.R. testified that she observed "[Sanchez] hit [B.G.] twice and then reach[] out for his pocketknife and stab[] him in the back of his neck." She testified that she also observed B.G. hit Sanchez but

8

described the action as defensive and that B.G. was blocking hits from Sanchez. She then observed Sanchez throw a knife into the water.

K.B. testified that he was working at a fishing tournament that was located at the boat ramp when he witnessed the fight between Sanchez and B.G. He stated he heard a commotion and noticed an argument between Sanchez and a person on a pontoon boat. He testified that he did not observe B.G. or anyone else get physically aggressive with Sanchez but said both B.G. and Sanchez were "cussing each other." According to K.B., Sanchez's passenger hit B.G. first, but he observed Sanchez hit B.G. a second time. Sanchez then pulled a knife out and "took a wild swing and hit [B.G.], who got blindsided with the knife at the base of his . . . neck." He testified that Sanchez was the only person he saw with a knife that day.

Sanchez's boat passenger testified for the defense.[4] He stated that he has known Sanchez for thirty years and considers Sanchez to be part of his family. He testified that he waited in the boat when Sanchez went to get his truck and trailer to load the boat. As he attempted to drive the boat onto the trailer, he heard Sanchez screaming "[g]et out of here[,] [w]e don't . . . need no trouble[,] [g]et away from me." He observed Sanchez standing between the boat trailer and the truck bed as three men approached Sanchez. He testified that the three men surrounded Sanchez

---

[4] Sanchez did not testify at trial.

9

and they were "pretty good sized guys." He then tied the boat to the pier and walked over to the group to "see what was going on." As he approached the group, he heard B.G., who was leaning against Sanchez's truck, say "[w]hat if I just whip yall's ass right now?" Then a "big melee broke out[,]" and both he and Sanchez were hit and knocked down. He testified that he saw two people were attacking Sanchez and that Sanchez pulled a knife out and lunged with the knife. He said that he did not see Sanchez stab B.G. but stated that Sanchez only pulled the knife out after he was attacked by two people. He believed that the men surrounding Sanchez could have caused "serious bodily injury" to Sanchez.

The jury convicted Sanchez of Aggravated Assault with a Deadly Weapon, and after a trial on punishment, the court sentenced Sanchez to eighteen years confinement in the Texas Department of Corrections. The trial court certified Sanchez's right to appeal, and Sanchez timely filed this appeal.

## II. The Jury Charge

### A. Deadly Weapon: Self-defense

In his first issue, Sanchez argues that the jury charge instruction on self-defense did not comply with the statutorily required definition of "deadly weapon self-defense." Sanchez acknowledges in his appellate brief that since his claim of self-defense involved the use of deadly force, the proper governing statute for the

10

jury instruction is Texas Penal Code section 9.32. *See* Tex. Penal Code Ann. § 9.32. However, Sanchez argues that a proper jury charge for a deadly force self-defense instruction should include the language from both sections 9.31 and 9.32. *See id.* §§ 9.31, 9.32. Sanchez contends that the jury charge failed to include broader self-defense language from Texas Penal Code section 9.31, which does not specify the use of deadly force, and must initially address the issue of self-defense based on "[Sanchez's] decision to use force in the first place." *Compare* Tex. Penal Code Ann. § 9.32 (addressing deadly force self-defense), *with* Tex. Penal Code Ann. § 9.31 (addressing non-deadly force self-defense). Sanchez argues that the jury must first consider whether the use of force, generally, under 9.31 is lawful under the facts of the case, and then consider whether the use of deadly force under 9.32 was lawful.

In his brief, Sanchez directs our attention to an unpublished case from the 13th Court of Appeals. *See Magill v. State*, No. 13-16-00128-CR, 2018 WL 1633484 (Tex. App.—Corpus Christi Apr. 5, 2018, pet. ref'd) (mem. op., not designated for pub.). Sanchez cites to *Magill* as an example that the language from both sections 9.31 and 9.32 should have been included in the jury charge for self-defense. *See id.* at *4. While *Magill* does illustrate a jury charge with language from both sections, it does not demonstrate that 9.32 has a two-prong test that requires language from both sections to be included in the jury charge. *See id.* at *4–7. The Court in *Magill*

11

did not address that issue. *See id.* Rather, our sister court found error in a jury charge that failed to use the penal code's amended wording and instead included a deleted statutory provision that had previously required a defendant to retreat before being entitled to use deadly force. *See id*. at *6–7. Such is not the case before us. Sanchez does not cite to any direct authority supporting his argument that the instruction in his case was erroneous and required inclusion of section 9.31 language, nor have we found any in our research.

Jury charge error is reviewed under a two-prong test. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). First, there needs to be a proper objection made at trial and "the accused must claim that the error was 'fundamental[.]'" *Id*. at 171. Second, a reversal will only be obtained if the objector can show "egregious harm[,]" i.e. harm that shows he was denied a "fair and impartial trial." *Id*. Generally, "a defensive issue is not 'applicable to the case' for purposes of Article 36.14 unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge." *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998); *see also* Tex. Code Crim. Proc. Ann. art. 36.14.[5] However,

---

[5] Article 36.14 outlines the requirements of the court's charge. *See* Tex. Code Crim. Proc. Ann. art. 36.14.

> Before said charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing, distinctly specifying each ground of

12

if the trial court undertakes upon its own initiative to instruct the jury on a defensive issue, it must do so correctly, and any error is subject to an *Almanza* review. *Mendez v. State*, 545 S.W.3d 548, 552–53 (Tex. Crim. App. 2018); *Almanza*, 686 S.W.2d at 171. "By *sua sponte* instructing the jury on self-defense, the trial judge assumed the duty to administer that instruction correctly." *Mendez*, 545 S.W.3d at 553. Our review shows that the trial court *sua sponte* added a self-defense instruction into the court's jury charge.[6] The jury charge contained the following language about self-defense:

**Relevant Statutes**

A person's use of deadly force against another that would otherwise constitute the crime of Aggravated Assault is not a criminal offense if the person reasonably believed the force used was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.

. . .

---

objection. Said objections may embody errors claimed to have been committed in the charge, as well as errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts, and in no event shall it be necessary for the defendant or his counsel to present special requested charges to preserve or maintain any error assigned to the charge, as herein provided.

*Id.*

[6] We note the jury instruction included by the trial court substantially tracks the Texas Criminal Pattern Jury Charges 32.3.

13

**Application of Law to Facts – Self-Defense**

To decide the issue of self-defense, you must determine whether the state has proved, beyond a reasonable doubt, one of the following:
1. The defendant did not believe his conduct was immediately necessary to protect himself against [B.G.'s] use or attempted use of unlawful deadly force; or
2. The defendant's belief was not reasonable; or
3. The defendant consented to the exact force used or attempted by [B.G.] against the defendant.

. . .

A defendant is entitled to an instruction on a defensive issue if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991). On the other hand, if the evidence, viewed in the light most favorable to the defendant, does not establish a defensive issue, the defendant is not entitled to an instruction on the issue. *Brazelton v. State,* 947 S.W.2d 644, 646 (Tex. App.—Fort Worth 1997, no pet.). Therefore, we must first decide whether there is any evidence that Sanchez used non-deadly force.

Section 9.31 and section 9.32 represent two different versions of self-defense, and although courts have used the term "self-defense" interchangeably between the two sections, they are distinct. *See Carmen v. State*, 276 S.W.3d 538, 541–43 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (noting that the Court of Criminal

14

Appeals and various sister Courts of Appeals have used the term "self-defense" interchangeably but explaining that the primary difference between the two sections is the use of deadly force.); *see also Gamino v. State*, 537 S.W.3d 507, 510–11 (Tex. Crim. App. 2017) (explaining that section 9.31 involves non-deadly force self-defense, whereas section 9.32 involves self-defense using deadly force).

Our examination of the record does not demonstrate evidence to justify inclusion in the jury charge language regarding "unlawful force" as provided in section 9.31. *See* Tex. Penal Code Ann. § 9.31. ("[A] person is justified in using force against another when and to the degree the actor reasonable believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.").

> Section 9.31(a), supra, justifies the use of force against another when *the actor reasonably believes it is immediately necessary to protect himself against the other's use of force or attempted use of unlawful force*. Thus, in order to justify the submission of a charge to the jury on the issue of self-defense, there must be some evidence in the record to show that the defendant was in some apprehension or fear of being the recipient of the unlawful use of force from the complainant.

*Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984).

There is no evidence that Sanchez used non-deadly force in response to any unlawful force of B.G. Sanchez's knife was "indisputably" capable of causing serious bodily injury or death to B.G., and the manner in which Sanchez used the

15

knife constitutes the use of deadly force in his attack.[7] *Ferrel v. State*, 55 S.W.3d

586, 592 (Tex. Crim. App. 2001). By definition, Sanchez used deadly force, and

therefore, a section 9.31 self-defense instruction is not applicable. *See id.*

Accordingly, we conclude that the trial court did not err by refusing to include an

expanded self-defense jury instruction in the application paragraph incorporating

section 9.31 language. *See id.*; *Juarez v. State*, 961 S.W.2d 378, 383 (Tex. App.—

Houston [1st Dist.] 1997, pet. ref'd) (finding that failure to include an application

paragraph on the defensive issue of "abandonment of the difficulty" not raised by

the evidence was not error); *Hutcheson v. State*, 899 S.W.2d 39, 43 (Tex. App.—

Amarillo 1995, pet. ref'd) (holding that the trial court was not required to apply

---

[7] In *Ferrel v. State*, the Court of Criminal Appeals held that for a defendant to be entitled to a non-deadly force instruction under section 9.31(a) of the Code of Criminal Procedure, there must have been some evidence that the instrument used was not capable of causing death or serious bodily injury in the manner of its use or intended use. 55 S.W.3d 586, 591–92 (Tex. Crim. App. 2001). In the case before us, Sanchez indisputably used a knife and inflicted serious bodily injury on the complainant. Sanchez's attack on B.G. with a knife is unequivocal evidence of a deadly weapon and deadly force under section 9.32. *See* Tex. Penal Code Ann. § 9.32; *see also Clark v. State*, 444 S.W.3d 671, 678 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (holding that an open pocketknife swung at the victim's face was sufficient evidence that the knife was a deadly weapon); *Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref'd) (determining a small knife that caused "superficial wounds" was a deadly weapon); *Rogers v. State*, 877 S.W.2d 498, 500 (Tex. App.—Fort Worth 1994, pet. ref'd) (explaining that a small pocketknife was a deadly weapon due to its capablity of causing serious bodily injury and in its manner of use).

abstract instruction on a defensive issue to facts of the case when evidence failed to raise the issue, even when the jury charge incorrectly allowed the jury to convict appellant on a lesser burden of proof than required by law). We overrule Sanchez's first issue.

**B. Verbal Provocation**

Sanchez argues in his second issue that the trial court erred when it denied his request to strike language in the jury instruction pertaining to verbal provocation and self-defense because the charge "contain[ed] superfluous language" that was confusing to the jury and improperly directed the jury's focus to a specific type of evidence. Quoting *Walters v. State*, Sanchez states that any "special, non-statutory instructions, even when they relate to statutory offenses or defenses, generally have no place in the jury charge." 247 S.W.3d 204, 211 (Tex. Crim. App. 2007) (citation omitted). Sanchez's reliance on *Walters* is misplaced. While the Court of Criminal Appeals in *Walters* held that an instruction on "prior verbal threats" was a jury charge error as it did not track the current statute that states "verbal provocation, by itself, is insufficient to support self-defense[,]" the Court addressed language regarding prior verbal threats clearly outside the statutory definition pertaining to verbal provocation and self-defense. *See id.* at 213–14.

Here, the trial court tracked the statutory language in the jury charge. In describing when the use of force is justified to claim self-defense, both sections 9.31 and 9.32 state that the defendant must "reasonably believe" that force is necessary to stop an immediate unlawful use of non-deadly or deadly force. *See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a). Section 9.31(b)(1) states that "[t]he use of force against another is not justified: []in response to verbal provocation alone[.]" *Id.* § 9.31(b)(1). The language in the jury charge states "[s]elf-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant." This language is directly derived from both sections 9.31(b) and 9.32. It does not contain superfluous language outside of the statute and does not direct the jury to any "specific evidence" as argued by Sanchez. *See Preston v. State*, No. 03-16-00573-CR, 2018 WL 3447713, at \*\*11–12 (Tex. App.—Austin July 18, 2018, no pet.) (mem. op., not designated for pub.). Sanchez's argument fails the first prong of *Almanza*, and the jury charge as written does not contain error. As such, we do not perform a harm analysis. *See Posey*, 966 S.W.2d at 60 ("Neither 'harm' standard set out in Article 36.19 as construed by *Almanza* applies unless an appellate court first finds 'error' in the jury charge."). We overrule Sanchez's second issue.

## III. Legal and Factual Sufficiency

Sanchez argues that the jury's verdict is not supported by legally sufficient evidence. Specifically, he argues that "[t]he State failed to prove beyond a reasonable doubt that [Sanchez] unjustifiably used deadly force self-defense."

Generally, once a defendant produces some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991); *Valverde v. State*, 490 S.W.3d 526, 527–28 (Tex. App.— San Antonio 2016, pet ref'd). "[A] defendant bears the burden of production and the State bears the burden of persuasion on a defense under Penal Code section 2.03." *Zuliani v. State*, 97 S.W.3d 589, 594 n.5 (Tex. Crim. App. 2003) (citing *Saxton*, 804 S.W.2d at 913–14). To meet its burden, the State is not required to produce additional evidence. *Saxton*, 804 S.W.2d at 913; *Valverde*, 490 S.W.3d at 528. If the jury finds the defendant guilty, it has made an implied finding against any defensive theory raised by the defendant. *Saxton*, 804 S.W.2d at 914; *Valverde*, 490 S.W.3d at 528 (citing *Zuliani*, 97 S.W.3d at 594).

As stated in *Valverde*,

[w]hen a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing

19

all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt."

490 S.W.3d at 528 (quoting *Saxton*, 804 S.W.2d at 914). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Valverde*, 490 S.W.3d at 528.

Sanchez does not contest the sufficiency of the evidence that he committed Aggravated Assault with a Deadly Weapon beyond a reasonable doubt; rather, he challenges the sufficiency of the evidence in the jury's rejection of his self-defense claim.

To prove the crime of Aggravated Assault with a Deadly weapon the State was required to prove, as stated in the indictment, that

> SAMUEL CECIL SANCHEZ . . . on or about August 6, 2016 . . . did then and there intentionally, knowingly, and recklessly use a deadly weapon, to wit: a knife that in the manner of its use and intended use was capable of causing death and serious bodily injury, and did then and there intentionally, knowingly, and recklessly cause bodily injury to [B.G.][.]

The evidence is undisputed by both the State and defense witnesses that Sanchez had a knife, and Sanchez used the knife to stab B.G. in a manner that could intentionally, knowingly, and recklessly cause bodily injury. Accordingly, the

20

evidence establishes every essential element of the offense of Aggravated Assault with Deadly Weapon beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 913–14. The dispute is whether Sanchez was acting in self-defense.

Next, we examine whether the jury "also would have found against [Sanchez] on the self-defense issue beyond a reasonable doubt." *See id*. The charge of the court stated that Sanchez would be justified in his actions if the evidence showed that he "reasonably believed the force used was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force." The trial court specifically stated that "[s]elf-defense does not cover conduct in response to verbal provocation alone." Testimony from several witnesses indicated that although there was a verbal altercation between B.G. and Sanchez on the boat ramp, Sanchez was the aggressor, and B.G. did not initiate physical contact. Testimony also established that B.G., his brother, and C.N. did not have weapons when they approached Sanchez. Additionally, the jury heard testimony that once Sanchez hit B.G., the blow caused B.G. to slip or fall, and after B.G. fell, Sanchez pulled a knife and stabbed B.G. in the neck. Bystander testimony established that Sanchez was the aggressor and sole individual with a knife during the fight. While Sanchez's boat passenger testified that Sanchez was surrounded by three men capable of causing "serious harm" to Sanchez, "[a] jury may accept one version of the facts and reject another,

21

and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *see also Saxton*, 804 S.W.2d at 914 ("Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory").

Having reviewed all the evidence in the light most favorable to the prosecution, we conclude the jury rationally could have found each element of the offense beyond a reasonable doubt and could have rejected Sanchez's claim of self-defense. We overrule Sanchez's last issue.

## IV. Indictment and Judgment

We note that neither party has brought to this Court's attention that the indictment and subsequent judgement of conviction contain an insufficient numerical recitation of the correct statute. The Texas Code of Criminal Procedure sets out the requirements for an indictment in article 21.02 and provides that the "offense must be set forth in plain and intelligible words." Tex. Code Crim. Proc. Ann. art. 21.02(7). An indictment is usually legally sufficient if it tracks the penal statute in question. *State v. Moff*, 154 S.W.3d 599, 602 (Tex. Crim. App. 2004). An

indictment must allege that (1) a person, (2) committed an offense. *Teal v. State*, 230 S.W.3d 172, 179 (Tex. Crim. App. 2007) (citing *Cook v. State*, 902 S.W.2d 471 (Tex. Crim. App. 1995)). To determine if a charging instrument alleges an offense, we must decide if the allegations are clear enough that one can identify the offense alleged. *See id.* at 180. A trial court and the defendant must be able to identify what penal code provision is alleged and whether that provision vests jurisdiction in the trial court. *See id.* An indictment that tracks the statutory language generally satisfies constitutional and statutory requirements. *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998).

The indictment in question properly identifies Sanchez and his crime, tracks the statutory language, placing Sanchez on sufficient notice of the charges. *See id.* As such, we modify the judgment of the trial court to reflect the correct numerical designation of the statute charged. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) (explaining Court's authority to reform the trial court's judgment to correct clerical errors.).

The trial court's judgment is modified to reflect that Sanchez was convicted under sections 22.01(a)(2) and 22.02(a)(2) of the Texas Penal Code.

## V. Conclusion

Having overruled all of Sanchez's issues on appeal, we affirm the trial court's judgment as modified to reflect that Sanchez was convicted under Texas Penal Code sections 22.01(a)(2) and 22.02(a)(2).

AFFIRMED AS MODIFIED.

_____
CHARLES KREGER
Justice

Submitted on August 12, 2019
Opinion Delivered April 8, 2020
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.