# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00406-CR

**Irving Torres, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 79400, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Irving Torres of indecency with a child, a second-degree felony.
*See* Tex. Penal Code § 21.11(a)(1), (d). The trial court entered judgment on the jury's verdict,
assessing punishment at seven years' imprisonment. In a sole appellate issue, Torres contends that
the trial court abused its discretion by admitting into evidence the video recording of the alleged
victim's forensic interview at a Children's Advocacy Center (CAC). Because Torres's counsel's
comments and cross-examination impliedly charged the alleged victim with recent fabrication
and improper influence affecting her trial testimony, the recording of the CAC interview became
admissible under Rule of Evidence 801(e)(1)(B). We affirm.

## BACKGROUND

The State indicted Torres with aggravated sexual assault, *see* Tex. Penal Code
§ 22.021(a)(1)(B)(i), (a)(2)(B), for having "cause[d] the penetration of the female sexual organ of

[M.W.], a child who was then and there younger than 14 years of age, by [Torres]'s finger."[1] At trial, Torres requested that the jury be instructed with a lesser included offense, indecency with a child, and the State agreed. The jury acquitted Torres of aggravated sexual assault but convicted him of indecency with a child, which does not require proof of penetration like the indictment for aggravated sexual assault did. *Compare id.* § 21.11(a)(1), *with id.* § 22.021(a)(1)(B)(i), (a)(2)(B).

M.W. was born in July 2002. After her parents separated and divorced, M.W. lived with her mother and visited her father from time to time. Torres later married M.W.'s mother and moved in with them. M.W. testified that a couple of years later, when she was around 10 or 11 years old, Torres abused her the "first time." M.W. ultimately testified to at least five instances of abuse by Torres, including that he penetrated her vagina with his hands at least five times, and gave details about three instances, occurring in her bedroom, the kitchen, and by her bookshelf.

M.W. testified that the first time that Torres abused her was in her bedroom. She was lying on her bed while her mother was busy "with something else," and Torres came into her room. He rubbed her thighs and touched her "in places you wouldn't normally touch." She testified that over time he kept doing similar things and that it "got worse," with his touching her breasts, butt, and vaginal area. This happened in several rooms of the house and always while her mother was either out of the home or using the restroom.

M.W. also testified that the first time Torres digitally penetrated her was in the kitchen. She was sitting at the table doing homework, and he approached her while her mother

---

[1] M.W. was a minor during the events underlying Torres's prosecution, so we will protect her identity. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

was in the restroom. He put his hands down her pants and grabbed her butt and breasts and eventually penetrated her vagina with his fingers.

The final instance of abuse was in M.W.'s room and ended near her bookshelf. M.W. testified that Torres came in her room and grabbed her, she tried to get out of his grasp, he dropped her, she hit her head near her bookshelf, Torres left the room, and she developed a mark on her forehead in the morning. Her mother took pictures of M.W.'s forehead and thought the injury was from M.W.'s tossing and turning at night.

M.W. did not report any of the alleged instances of abuse to her mother until she was 12 years old, when she saw an online article about what sexual assault is, and it sounded like what had happened to her. She told her mother what Torres had done, but she did not believe her. Her mother discussed the issue with leaders at her religious institution, rather than calling police, and confronted Torres. Torres explained that he had only been play-fighting with M.W., so any inappropriate touching was an accident. The abuse stopped after Torres was confronted.

About two years later, M.W. testified, a classmate raped her. M.W. saw a counselor and in the course of therapy sessions disclosed to the counselor and then to her father what Torres had done years earlier. Her father called the police, M.W. spoke with police and gave a statement, and Detective Angela Mathiews began investigating both the alleged abuse by Torres and the alleged rape by the classmate. M.W. took part in a forensic interview at a nearby CAC. At one point during the interview, M.W. said "that there was no penetration except for [Torres's] fingers in [her] vagina." She said that there was no penetration because she then believed that penetration meant only penile penetration of a vagina.

After the CAC interview, a Sexual Assault Nurse Examiner (SANE) examined M.W. As a result of her investigation, which included reviewing witness statements and the CAC

3

interview, Det. Mathiews recommended charging Torres with indecency with a child and not aggravated sexual assault.

The State indicted Torres for aggravated sexual assault, and the case went to trial before a jury. The State called several witnesses, including M.W., her mother, her father, Det. Mathiews, the SANE who examined M.W., M.W.'s counselor, and the CAC forensic interviewer. After all its witnesses testified, the State offered into evidence the recording of the CAC interview, and Torres objected. After arguments from counsel, the trial court admitted the recording, explaining that the Rule of Optional Completeness supported admission.

The jury convicted Torres of the lesser included offense of indecency with a child and acquitted him of aggravated sexual assault. The trial court entered judgment on the verdict, and Torres now appeals.

## ADMISSION OF RECORDING OF CAC FORENSIC INTERVIEW

### I. Standard of review

We review the trial court's admission of the recording of the CAC forensic interview for an abuse of discretion. *See Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007). A trial court abuses its discretion only if its decision lies outside the "zone of reasonable disagreement." *Walters*, 247 S.W.3d at 217. We must affirm the trial court on any legal theory supported by the record, even if the theory is not one on which the trial court itself relied. *See State v. Esparza*, 413 S.W.3d 81, 85 & n.17 (Tex. Crim. App. 2013); *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); *Miles v. State*, 488 S.W.2d 790, 792 (Tex. Crim. App. 1972). Our review must focus on the record before the trial court when it admitted the evidence at issue. *Carrasco*, 154 S.W.3d at 129; *Weatherred v. State*, 15 S.W.3d 540, 542–43 (Tex. Crim. App. 2000).

4

**II.**     **All four elements of Rule 801(e)(1)(B) are supported by the record.**

Torres's appellate brief only addresses two rules of evidence—Rules of Evidence 801(e)(1)(B) and 107—arguing that neither supported admitting the recording over his objections. At trial, Torres objected on grounds of hearsay, relevance, and Rule of Evidence 403. But in his appellate brief, Torres does not argue why the recording was hearsay, was irrelevant, or would have failed a Rule 403 balancing. Instead, he argues only that admitting the recording as evidence under either Rule 801(e)(1)(B) or Rule 107 was an abuse of discretion that harmed him. Given these arguments on appeal, if we hold that the trial court's admission of the record was not an abuse of discretion under either Rule 801(e)(1)(B) or Rule 107, then that resolves all arguments that Torres has made under his sole appellate issue. *See* Tex. R. App. P. 47.1.

Rule 801(e)(1) excludes from the general prohibition on hearsay certain prior statements by a declarant who testifies and is subject to cross-examination about the prior statement. One such category of non-hearsay is statements that are "consistent with the declarant's testimony and [are] offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Tex. R. Evid. 801(e)(1)(B); *Hammons*, 239 S.W.3d at 804 ("Rule 801(e)(1)(B) gives substantive, non-hearsay status to prior consistent statements of a witness 'offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.'"). To be admissible,

> (1) the declarant must testify at trial and be subject to cross-examination;
>
> (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;
>
> (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and,

5

(4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Hammons*, 239 S.W.3d at 804 (citing *Tome v. United States*, 513 U.S. 150, 156–58 (1995)). Because Rule 801(e)(1)(B) mirrors its federal counterpart, "federal decisions provide helpful analysis." *Id.* M.W. testified at trial and was cross-examined, so the first element is met.

### A. *Implied charge of recent fabrication or improper influence or motive*

Under the second element, the foundation requirement for an implied charge of fabrication or improper influence is "minimal." *See id.* Although not just any attack on a witness's credibility or memory amounts to a charge of fabrication or improper motive, "there need be only a suggestion of conscious alteration or fabrication" to trigger the trial court's "substantial discretion to admit prior consistent statements under the rule." *Id.* at 804–05.

To decide whether an opposing party impliedly charged a witness with fabrication or improper influence or motive, the reviewing court reviews everything before the trial court when it made its admissibility ruling. *See id.* at 807–09; *see also Carrasco*, 154 S.W.3d at 129; *Weatherred*, 15 S.W.3d at 542–43. The review may extend to matters that came after the ruling, like the opposing party's closing argument, insofar as those matters confirm that an implied charge occurred before the ruling. *See Hammons*, 239 S.W.3d at 807–08.

During our review, we are looking not only for overt charges of fabrication or improper influence or motive but also more subtle forms. A sufficient charge can be merely implied: "a charge of recent fabrication or improper motive may be subtly *implied* through tone, tenor, and demeanor during the entirety of the cross-examination; such an attack may not be immediately apparent from the specific wording of the questions asked, but becomes obvious only during the attorney's final argument." *Id.* at 799; *accord id.* at 808. Further, "[t]he specific

6

words . . . used during cross-examination might be interpreted as either a benign inquiry into [a witness]'s confusion over the dates and locations where the sexual encounters took place or as an implied charge of recent fabrication," "[b]ut much of the force of cross-examination depends upon the tone and tenor of the questioning, combined with the cross-examiner's demeanor, facial expressions, pregnant pauses, and other nonverbal cues" and therefore amount to an implied charge even when no charge was made in express words. *Id.* at 808; *see also id.* at 808 n.27 ("sometimes the attacking party leaves these points just below the surface, and relies instead on innuendo or the suggestive force of questions or underlying facts to carry the message"). With these subtleties in mind, the Court of Criminal Appeals has told reviewing courts what to look for:

> [A] reviewing court, in assessing whether the cross-examination of a witness makes an *implied* charge of recent fabrication or improper motive, should focus on the purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court. Courts may also consider clues from the voir dire, opening statements, and closing arguments. From the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, could a reasonable trial judge conclude that the cross-examiner is mounting a charge of recent fabrication or improper motive?

*Id.* at 808–09 (internal quotation omitted). The required review involves "the totality of the cross-examination, not isolated portions or selected questions and answers." *Id.* at 808. We review the record in the light most favorable to the trial court's admissibility ruling. *Klein v. State*, 273 S.W.3d 297, 304 (Tex. Crim. App. 2008).

       1.     *Implied charges of fabrication and improper influence through voir dire, opening statement, and cross-examinations*

Here, during voir dire, Torres's counsel raised the concept of witnesses—including child witnesses—lying while testifying. *Hammons*, 239 S.W.3d at 804 n.15 (insinuation during voir dire, and similar insinuations at other times, that witness recently fabricated testimony

7

supports admission of prior consistent statement (citing *McInnes v. Yamaha Motor Corp., U.S.A.*, 673 S.W.2d 185, 189 (Tex. 1984))). Counsel asked the venire panel who among them had children and "if your kids have never lied." He then said that despite whether lies are small or big, they are still lies. Specifically about witnesses, he discussed "evaluating real people sitting in a chair," "[p]eople that are going to be under oath," and asked the panel, "How many of you believe that everybody who gets up on the stand is going to tell the truth?" Shortly after, he reraised the topic of "adults lying, kids lying" and asked, "Why might somebody lie on the witness stand?" Hearing a few answers, he emphasized "revenge," "to get out of a bad situation," and "to get their way with something." He rounded out the topic by asking, "[H]ow many of you think false accusations or allegations happen?" After planting those seeds, counsel told the empaneled jury during opening statement that they should "[l]isten to the witnesses carefully" and "[m]ake sure you understand what they are saying, when they said it, and why they are saying it." *See id.* at 804–05 & n.16, 808 (noting that "sinister seed of innuendo" may be "sowed" before trial court properly admits prior consistent statement and only "c[o]me to full fruition" by express charges of fabrication made after admissibility ruling).

During witness testimony, Torres's counsel cross-examined several of the State's witnesses with a focus on M.W.'s testimony. With M.W. herself, Torres's counsel's questions supported implied charges of improper influence and fabrication. Counsel implied improper influence by questioning M.W. about "who all [she] spoke to about what you just testified to," including police, her counselor, the SANE, and the CAC forensic interviewer. *See id.* at 807 n.25 (prior consistent statement admissible in part because of cross-examination of child victim about "the mother prompting and preparing her for trial" (citing *State v. Brotherton*, 384 N.W.2d 375, 380 (Iowa 1986))); *Martinez v. State*, 276 S.W.3d 75, 82–83 (Tex. App.—San Antonio 2008,

8

pet. ref'd) (cross-examination that intimated either that child victim was "coached" by prosecutor or merely that victim's testimony was not credible supported implied charge because rule requirement is minimal and reviewing court must defer to trial court's unstated observations of "the tone and tenor of the questioning, combined with the cross-examiner's demeanor, facial expressions, pregnant pauses, and other nonverbal cues"). Counsel later made a similar implied charge of improper influence when cross-examining the SANE, by suggesting law-enforcement influence because they—and not M.W. or her family—arranged M.W.'s SANE examination.

Also when cross-examining M.W., counsel implied fabrication in at least two ways. First, after M.W.'s testimony revealed that her mother did not believe her when she first reported the abuse, Torres's counsel implied fabrication in her testimony by suggesting that it included details that M.W. had not shared with her mother. Concerning the pictures of M.W.'s forehead after the bookshelf incident, counsel confirmed that M.W. never told her mother that the injury was from Torres dropping her and not from tossing and turning while asleep. Counsel asked: "You didn't think to tell her that, hey, you took a picture of it, I'm telling you the truth?" And he confirmed that M.W. thought that her mother did not believe her first report of abuse and then asked why M.W. would not bring up the forehead injury with her. The trial court reasonably could have concluded that these questions implied that M.W. fabricated details in her testimony that she did not tell her mother about years earlier. *See White v. State*, 256 S.W.3d 380, 383–84 (Tex. App.—San Antonio 2008, pet. ref'd) (cross-examination of complainant that highlighted "discrepancies between her testimony at trial and her statement to police," arising from her mentioning details at trial that she did not mention any earlier, supported admission of prior consistent statement); *see also Gutierrez v. State*, No. 11-18-00298-CR, __ S.W.3d __, 2020 WL 6791050, at *8 (Tex. App.—Eastland Nov. 19, 2020, pet. ref'd) (op., designated for publication)

9

(prior consistent statement admissible in part because cross-examination suggested that "trial testimony contained matters that [child victim] had not previously alleged").

Second, counsel asked M.W. a litany of questions about whether she could remember other details about the abuse that she otherwise testified about. About the bedroom incident, he questioned M.W. about whether her door was locked; whether Torres locked it after coming in; whether anyone else was home; whether it happened during the day or at night, on a weekday or weekend day, and during summertime or the school year; whether she fought back and made it off the bed; and whether she screamed or was prevented from or threatened against calling out. Similarly, counsel asked M.W. for other acts of abuse "that you have details about" and then tested her claims with an even longer series of questions about whether M.W. remembered certain other details of the events or remembered how long she waited before telling her mother about them. Counsel also questioned M.W. about how she "kn[e]w that for a fact that at the kitchen table incident that [her mother] was in the guest bathroom." And about the bookshelf incident and other ones involving scuffles, counsel probed for a detail missing from M.W.'s testimony: "[I]n the times that you described where my client came in and you fought back where he grabbed your ankles or picked you up, do you remember ever thrashing and kicking the wall?" The trial court reasonably could have concluded that all these questions amounted to so sustained an attack on M.W.'s memory of events described in her testimony that Torres's counsel was implying that the testimony was fabricated because it lacked these details. *See Hammons*, 239 S.W.3d at 805 & n.16 (describing trial courts' wide discretion to admit prior consistent statements because actions merely "*interpretable as*" charges of fabrication can suffice); *id.* at 805 n.19 ("videotaped interview of child victim was admissible" in part because "defense counsel presented intense and very capable cross examination of the complainant" (citing and quoting *Wylie v. State*, 908 S.W.2d 307, 310

10

(Tex. App.—San Antonio 1995, pet. ref'd))); *id.* at 807 n.25 (prior consistent statement admissible in part because of cross-examination of child victim about "her present memory" (citing *Brotherton*, 384 N.W.2d at 380)).

During cross-examination of Det. Mathiews, Torres's counsel implied fabrication in M.W.'s testimony by contrasting its assertion of digital penetration of her vagina with the earlier CAC interview, after review of which Det. Mathiews did *not* recommend a charge that required proof of digital penetration. Torres's counsel elicited Det. Mathiews' view that her investigation supported the offense of indecency with a child and not aggravated sexual assault because, Det. Mathiews testified, "during [M.W.'s] accounts of the events, it was unclear if there was an actual penetration." Counsel confirmed that those "accounts" included the CAC interview and that Det. Mathiews concluded from them that she wanted a charge of indecency with a child and not aggravated sexual assault. The trial court reasonably could have concluded that by eliciting this cross-examination testimony, Torres's counsel implied that M.W.'s testimony about digital penetration was fabricated.

Finally, with M.W.'s counselor, Torres's counsel contrasted the counselor's written statement for police, which said that M.W. denied digital penetration, with M.W.'s trial testimony to the contrary. Counsel confirmed that the counselor's statement reflected her therapy notes and that the notes themselves reflected M.W.'s reports to her. He then confirmed that the counselor's statement says, "child denies . . . any penetration with fingers or penis," and that this denial matched her therapy notes. The trial court reasonably could have concluded that this questioning implied that M.W.'s testimony about digital penetration was fabricated.

After the State's witnesses, the State offered the recording of the CAC forensic interview into evidence. The trial court admitted it over Torres's objections.

11

### 2. *Confirming examples from Torres's later testimony and closing argument*

Examples from after admission of the recording confirm that Torres's counsel had levied implied charges of fabrication and improper influence affecting M.W.'s testimony. Torres elected to testify, and the prosecutor confronted him with M.W.'s reports of abuse. In response to one report, Torres explained that "I didn't put my hand on her breasts" and responded affirmatively when asked whether M.W. "was lying about" that report in her testimony. Torres later testified expressly: "That's what I'm telling the jury," that M.W. "is lying about everything." He also bolstered an earlier charge of improper influence by testifying that M.W. "talks to so many people" about the substance of her allegations. Finally, and linking up with his counsel's cross-examination of M.W., Torres testified that when her mother confronted him about M.W.'s reports of abuse, her mother mentioned fewer of the alleged details than M.W. mentioned during her testimony, implying that M.W. fabricated those extra details.

In his closing argument, Torres's counsel revisited by-now-familiar themes. He implied fabricated testimony:

> [Y]ou have testimony from, I think, about ten witnesses that you got to consider. And when you do that, you got to look at not just what was said, but how it was said, who was saying and whether or not they changed it from the time they said it the first time or the second time or they gave a statement or changed it or amended it on the witness stand.

And he raised fabrication by M.W.: "Does it make sense to you that [M.W.] is telling you the entire truth because she's told this story so many times? Or does it make sense to you it's easier with the telling?" *See Weatherly v. State*, 283 S.W.3d 481, 487, 493–94 (Tex. App.—Beaumont 2009, pet. ref'd) (prior consistent statement admissible in part because of counsel's questions about "practice effect," which holds that repeating something untrue helps repeater believe it to be true).

12

We conclude that Torres's counsel's voir dire statements, his reference to the topic of witness lying during opening statement, and his questions throughout cross-examination of M.W. and others all together would have allowed the trial court reasonably to find the second Rule 801(e)(1)(B) element to be met when it admitted the recording. Our conclusion is supported by the confirming instances from Torres's testimony and his counsel's closing argument.

Relatedly, because the trial court could reasonably have found an attack on M.W.'s trial testimony, the fourth element is also met because the CAC interview preceded M.W.'s trial testimony. *See Gutierrez*, 2020 WL 6791050, at \*8 (prior consistent statement admissible when cross-examination sufficiently attacked child victim's trial testimony: "while Appellant alleged that A.G. fabricated the allegations from the beginning, he also asserted that her trial testimony contained matters that she had not previously alleged").

### B. The prior statement's consistency

Finally, under the third element, "the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony." *Hammons*, 239 S.W.3d at 804. The prior statement need only be "generally consistent" with the later statements. *Id.*; *Dibello v. State*, 432 S.W.3d 913, 915 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

In the recording of the CAC interview, M.W. told the interviewer that Torres digitally penetrated her vagina about five to ten times. One such time occurred while she was on her bed. She also told the interviewer that Torres touched her breasts, vagina, and butt multiple times and that the only thing that Torres ever used to penetrate her vagina was his fingers. She said that the instances of abuse began when she was 10 or 11 years old and stopped when she was

12 years old because that is when she told her mother about what had been happening. The trial court reasonably could have concluded that all this was generally consistent with her testimony.

Further, she told the interviewer about an instance of abuse generally consistent with her testimony about the kitchen incident: while she was doing homework in the kitchen, Torres put his hands down her pants and grabbed her butt and breasts. She told the interviewer about another instance generally consistent with her testimony about the bookshelf incident: that Torres grabbed her in her room, she tried to get out of his grasp, he dropped her, she hit her head near her bookshelf, Torres left the room, and she developed a mark on her forehead in the morning.

We conclude that the trial court reasonably could have concluded that the recording of the CAC forensic interview was consistent with M.W.'s testimony under Rule 801(e)(1)(B), meeting the rule's third element. Because the record meets all four of the rule's elements, the trial court would not have abused its discretion by admitting the recording under Rule 801. *See Esparza*, 413 S.W.3d at 85 & n.17; *Carrasco*, 154 S.W.3d at 129; *Miles*, 488 S.W.2d at 792. We therefore overrule Torres's sole appellate issue.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: May 5, 2021

Do Not Publish